**In re ITEL SECURITIES LITIGATION.**

**This Document Relates to All Actions.**

**No. C 79–2168 RPA.**

United States District Court,
N. D. California.

Jan. 22, 1981.

**106**

Jeremiah F. Hallisey, O'Brien & Hallisey, San Francisco, Cal., liaison counsel, for plaintiffs.

Arthur N. Abbey, Law Offices of Arthur N. Abbey, New York City, for Frank Herzlin and Dorothy F. Gray.

Jeremiah F. Hallisey, O'Brien & Hallisey, San Francisco, Cal., for Ruby Peterson.

Donald N. Ruby, Wolf, Popper, Ross, Wolf & Jones, New York City, David B. Flinn, Leland, Parachini, Steinberg, Flinn, Matzger & Melnick, San Francisco, Cal., for Salvatore and Hilda Laurenzano.

Daniel W. Krasner, Wolf, Haldenstein, Adler, Freeman & Herz, New York City, for Joseph Levit.

Robert Plotkin, Law Offices of Robert Plotkin, Chicago, Ill., James Frank Fotenos, Law Offices of Fotenos & Thomas, San Francisco, Cal., for Gerhard K. Nonnenmacher.

Paul F. Bennett, David B. Gold, A.P.C., San Francisco, Cal., for Tilly Gailliard.

Phillip W. Moore, III, Law Offices of Phillip W. Moore, III, Washington, D. C., for Susan Wilhelm.

W. Robert Morgan, Morgan, Zazueta, Morgan, Towery, Morgan & Spector, San Jose, Cal., for Harold C. Hanke.

Leonard Barrack, Barrack, Rodos & McMahon, Philadelphia, Pa., for Louis Agnes.

Guido Saveri, Saveri & Saveri, San Francisco, Cal., for Alan Mailman.

Michael N. Khourie, Broad, Khourie & Schulz, San Francisco, Cal., for Robert C. Gloss.

Alvin H. Goldstein, Jr., Goldstein & Phillips, San Francisco, Cal., for Arnold Goldschlager.

John Clark, Pettit & Martin, San Francisco, Cal., liaison counsel, for defendants.

Theodore Russell, Pettit & Martin, San Francisco, Cal., for Itel Corp.

Norman Ray Grutman, Vito C. Casoni, Grutman & Schafrann, New York City, Philip B. Bass, R. David Mishel, Titchell, Maltzman, Mark, Bass & Ohleyer, San Francisco, Cal., for Gary B. Friedman.

M. Laurence Popofsky, Steven M. Block, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for Gerald R. Alderson, John H. Chase, Robert C. Hood, Patrick B. McManus, R. Douglas Norby and Thomas S. Tan.

Richard Haas, Lasky, Haas, Cohler & Munter, San Francisco, Cal., for Peter S. Redfield.

Melvin R. Goldman, David G. Robertson, Morrison & Foerster, San Francisco, Cal., for Richard H. Lussier.

Bartlett A. Jackson, Petty, Andrews, Tufts & Jackson, San Francisco, Cal., for John H. Anderson, Thomas A. Bartlett, Gilbert E. Cox, Roderick C. M. Hall, Daniel D. Jackson, C. R. Leslie, Franklin B. Lincoln, William B. McWhirter, Fred H. Merrill and James A. Vaughn.

Richard J. Lucas, Tower C. Snow, Orrick, Herrington, Rowley & Sutcliffe, San Francisco, Cal., Thomas A. Burton, Thomas W. Kelly, Breed, Abbott & Morgan, New York City, for Blyth Eastman Dillon & Co., Inc. and Kidder Peabody & Co., Inc.

Graham B. Moody, Jr., Philip R. Rotner, McCutchen, Doyle, Brown & Enerson, San Francisco, Cal., Leonard P. Novello, Peat, Marwick, Mitchell & Co., New York City, for Peat, Marwick, Mitchell & Co.

James R. Parrinello, Dobbs & Nielsen, San Francisco, Cal., for John Clark.

## OPINION AND ORDER

AGUILAR, District Judge.

This action is before the Court on plaintiffs' motion to certify certain proposed classes of defendants.

Past and present shareholders of Itel Corporation bring the instant action against

Itel Corporation; certain officers and directors of Itel; Peat, Marwick, Mitchell & Co., Itel's accountants; and the investment bankers who acted as the underwriters of two Itel public security offerings in 1978. The Consolidated Amended Supplemental Complaint[1] alleges violations of §§ 11, 12 and 15 of the Securities Act of 1933 (15 U.S.C. §§ 77k, 77l, 77o), violations of §§ 10(b) and 20 of the Securities and Exchange Act of 1934 (15 U.S.C. §§ 78j(b), 78t) and Rule 10b–5 (17 C.F.R. § 240.10(b)–5), and violations of California corporate securities laws. The complaint also alleges causes of action for common law fraud and deceit and negligence.

Before being assigned this case, another judge of the court ordered that "[t]his action shall be maintained as a class action on behalf of a class of plaintiffs consisting of all persons, except defendants, who purchased the securities of Itel during the period from May 25, 1977 through August 6, 1979, inclusive." (Order re Plaintiff Class and Motions to Dismiss filed May 22, 1980). Sixteen persons are presently designated as plaintiff class representatives.

*Factual Background.*

The Court will set forth a very brief summary of the facts underlying this rather factually complex lawsuit.[2]

Throughout the period between May 25, 1977, and August 6, 1979, Itel Corporation was principally engaged in the computer business. (A small part of Itel's business was the sale and lease of transportation equipment). This computer business encompassed two separate types of business activity. On one side, Itel marketed and leased "Advanced Systems" computers under its own name. The hardware and software for these computers were compatible with the IBM "System 370" computer line. Itel also provided maintenance and other related services for this computer equipment. On the other side, Itel was engaged in a lease marketing program by which Itel

acted as broker and lease underwriter in arranging leases of IBM System 370 computers. Itel was compensated for its lease underwriting services in cash; Itel also received a share of the residual value of the leased computer equipment on termination of the lease. Itel recorded the present value of its share of the residual value of the leased computer equipment as an asset on its financial statements.

In most of the leases of computer equipment arranged by Itel, it was provided that under certain conditions the lease could be canceled prior to the expiration of the term of the lease without penalty. This cancellation provision exposed Itel to substantial financial obligations and risks, as Itel would suffer a loss if it was unable to re-lease or sell this computer equipment. Itel was insured against such a loss with Lloyds of London.

Beginning in 1978, Lloyds of London refused to continue to provide Itel this lease cancellation insurance. Accordingly Itel had to drastically reduce its lease underwriting business. And, as IBM continually announced new and better models of computers that worked faster and with less expense than prior models, Itel suffered further business decline. Itel's asset of the residual value of old model leased computers became almost valueless, and Itel was not fully protected from lease cancellations resulting from businesses wanting the latest line of computers. These factors began to have a financial effect on Itel in 1979, when Itel posted huge quarterly losses and was forced to effectively withdraw from the computer business.

During 1978, as Itel was being required to make major business changes and facing a declining financial picture, Itel made two public offerings of securities. In April of 1978, Itel offered for sale 100,000 units of 9⅝% subordinated debentures due in 1998. The 9⅝% debentures were offered pursuant to a Registration Statement and Prospectus

---

1. Eleven separate actions were consolidated by this complaint.

2. This factual summary is drawn from the complaint and from other papers filed with the court.

which described a financially healthy Itel Corporation with good future prospects. The 9⅝% debentures were marketed by 104 underwriters. Blyth Eastman Dillon & Company (hereinafter "Blyth") acted as lead underwriter, and subscribed to 21,350 units.

In December of 1978, Itel made a $75 million offering of 10½% sinking fund debentures. The 10½% debentures were offered pursuant to a Registration Statement & Prospectus which again characterized Itel as financially sound with good future prospects. The 10½% debentures were marketed by 113 underwriters. Blyth again was designated as the lead underwriter; Blyth subscribed to $15 million of the debentures.

Plaintiffs allege that each Registration Statement & Prospectus was false and misleading in that each, among numerous other alleged failings, overstates Itel's assets and future prospects, and fails to disclose the facts and effects of the loss of the lease cancellation insurance and of IBM's new computer products. Pertaining to the present motion, plaintiffs sue the underwriters of each offering alleging violations of §§ 11 and 12(2) of the Securities Act of 1933 claiming that the 9⅝% and the 10½% debentures were each offered to the public through the use of a false and misleading Registration Statement & Prospectus.

*Proposed Defendant Classes.*

Plaintiffs seek certification of the following classes:

(1)(a) Underwriters of the 9⅝% debentures as to violation of § 11.

(1)(b) Underwriters of the 9⅝% debentures as to violation of § 12(2).

(2)(a) Underwriters of the 10½% debentures as to violation of § 11.

(2)(b) Underwriters of the 10½% debentures as to violation of § 12(2).

As to violations of § 12(2), plaintiffs seek certification of defendant classes as to one issue only: whether the registration statements and prospectuses included untrue statements or omissions which were materially misleading. Plaintiffs name Blyth as representative of all defendant classes.

For the reasons discussed below, the Court grants plaintiffs' motion for defendant class certification in all respects.

*General Class Action Principles.*

Certification of defendant classes is contemplated by section (a) of Rule 23 of the Federal Rules of Civil Procedure which states in part that "[o]ne or more members of a class may sue *or be sued* as representative parties on behalf of all." (Emphasis added). In order to certify a class, the court must be satisfied that (1) the class is so numerous that joinder of all members is impracticable (the "numerosity" requirement); (2) there are questions of law or fact common to the class (the "commonality" requirement); (3) the claims or defenses of representative parties are typical of the claims or defenses of the class (the "typicality" requirement); and (4) the representative parties will fairly and adequately protect the interests of the class (the "adequacy of representation" requirement). F.R. C.P. 23(a).

Once these prerequisites to maintaining a class action are satisfied, the class may be certified if one of the following provisions of Rule 23 apply:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby mak-

ing appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action. F.R.C.P. 23(b)

As certification, especially of a defendant class, largely depends on the substantive issues underlying the action allegedly requiring class treatment, the propriety of granting plaintiffs' motion to certify defendant classes will be addressed in relation to the causes of action for which class treatment is sought, rather than in relation to each debenture offering. Because of the many similarities between the 9⅝% and 10½% offerings, both offerings can be grouped together while determining whether defendant class certification is proper as to each cause of action.

## CERTIFICATION OF DEFENDANT CLASSES FOR PURPOSES OF LITIGATING THE § 11 CAUSES OF ACTION

Plaintiffs seek certification of classes of defendant underwriters of the 9⅝% and 10½% offerings for purposes of determining liability under § 11 of the 1933 Act. Certification is claimed to be proper under subsection (b)(3) of Rule 23. Blyth, the only defendant to submit opposition to plaintiffs' motion to certify, in essence admits that certification of defendant classes

for each debenture offering is proper for litigating violations of § 11, stating that "this suggestion sounds sensible." (Blyth's Opposition to Motion for Certification of Defendant Classes at p. 8). However, Blyth asks that the court limit class treatment to only those issues where the interests of all underwriters of each class are identical.

In the case from this district of *In re the Gap Stores Securities Litigation*, 79 F.R.D. 283 (N.D.Cal.1978), Judge Spencer Williams, in a scholarly opinion, fully discusses the issues applicable to certification of a defendant class of underwriters who are sued for violating § 11 of the 1933 Act. The court in that case found Rule 23 requirements to be met and determined that class treatment of the underwriters was appropriate. This Court will rely to a great extent on the *In re Gap Stores* decision in certifying classes of defendant underwriters in this case for § 11 litigation. This Court will also follow the lead of the court in *In Re Gap Stores* and analyze the nature and range of proof necessary to establish, or escape, liability under § 11, before the requirements of Rule 23 are discussed. Once this is done, an analysis of whether the Rule 23 requirements are met can be more easily made.

*Issues and Proof under § 11.*

Section 11 of the Securities Act of 1933 (15 U.S.C. § 77k) provides in part:

(a) In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue—

(1) every person who signed the registration statement;

(2) every person who was a director of (or person performing similar functions)

or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;

(3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner;

(4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him;

(5) every underwriter with respect to such security,

\*　　\*　　\*　　\*　　\*　　\*

(b) Notwithstanding the provisions of subsection (a) of this section no person, other than the issuer, shall be liable as provided therein who shall sustain the burden of proof—

\*　　\*　　\*　　\*　　\*　　\*

(3) that (A) as regards any part of the registration statement not purporting to be made on the authority of an expert, and not purporting to be a copy of or extract from a report or valuation of an expert, and not purporting to be made on the authority of a public official document or statement, he had, after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the registration statement became effective that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading;

\*　　\*　　\*　　\*　　\*　　\*

(c) In determining for the purpose of paragraph (3) of subsection (b) of this section, what constitutes reasonable investigation and reasonable ground for belief, the standard of reasonableness shall be that required of a prudent man in the management of his own property.

\*　　\*　　\*　　\*　　\*　　\*

(e) The suit authorized under subsection (a) of this section may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought: *Provided,* That if the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable. In no event shall any underwriter (unless such underwriter shall have knowingly received from the issuer for acting as an underwriter some benefit, directly or indirectly, in which all other underwriters similarly situated did not share in proportion to their respective interests in the underwriting) be liable in any suit or as a consequence of suits authorized under subsection (a) of this section for damages in excess of the total price at which the securities underwritten by him and distributed to the public were offered to the public.

\*　　\*　　\*　　\*　　\*　　\*

(f) All or any one or more of the persons specified in subsection (a) of this section shall be jointly and severally liable, and every person who becomes liable to make any payment under this section may recover contribution as in cases of contract from any person who, if sued separately, would have been liable to make the same payment, unless the person who has become liable was, and the other was not, guilty of fraudulent misrepresentation.

(g) In no case shall the amount recoverable under this section exceed the price at which the security was offered to the public.

■ For the plaintiffs to prove a prima facie violation of § 11, they must establish that the registration statement contained a material misrepresentation or omission. § 11(a); *and see Montague v. Electronic Corp. of America*, 76 F.Supp. 933, 935 (S.D.N.Y.1948). If this is established, defendants have as an affirmative defense that the plaintiff purchased the security with knowledge of the material misrepresentation or omission. § 11(a); *and see Feit v. Leasco Data Processing Equipment Corp.*, 332 F.Supp. 544, 575 (E.D.N.Y.1971). A further affirmative defense available to the underwriter defendants is that they exercised due diligence, i. e., that they conducted a reasonable investigation and had reasonable grounds to believe that the statements in the registration statement were true and that there were no material omissions. § 11(b)(3)(A); *and see In re Gap Stores, supra*, 79 F.R.D. at 297.

The court in *In re Gap Stores* discussed another possible affirmative defense to section 11 liability, that defense being whether the lead, or managing, underwriter exercised due diligence. *Id.* at 300–302. The court described the question of whether participating underwriters may delegate their investigatory responsibilities to the lead underwriter as an "open" one. *Id.* at 300. Thus, if it can be proved that Blyth exercised due diligence in offering the securities to the public, all underwriters may be able to escape liability.

A defense available to the underwriters which relates to damages is that the diminution in the value of the security did not result from the misrepresentation or omission. *Emmi v. First-Manufacturers National Bank*, 336 F.Supp. 629, 636–637 (S.D. Maine 1971). The actual calculation of plaintiffs' damages depends on whether the plaintiffs still hold the securities purchased, and the value of the securities when purchased, when sold, and when suit was brought. § 11(e); *and see In re Gap Stores, supra*, 79 F.R.D. at 298. The maximum amount of damages recoverable by each plaintiff is the price at which the security was offered to the public. § 11(g).

It is important to point out the provision of § 11 that defendants found to have violated the section are jointly and severally liable. § 11(f). Thus, a plaintiff can recover his damages from any and all underwriters (as well as other defendants) who are found to have violated § 11. However, § 11 limits damages against each underwriter to the total price at which the securities underwritten and distributed by the underwriter were offered to the public. § 11(e).

## RULE 23 REQUIREMENTS.

Having discussed the issues likely to arise during litigation over a claimed violation of § 11, the Court will now determine whether the requirements of Rule 23 for class certification have been met.

*The Four Prerequisites.*

1. *Numerosity.*

The prospective class of the underwriters of the 9⅝% offering consists of 104 underwriters. The prospective class of underwriters for the 10½% offering consists of 114 underwriters. These numbers of defendants are sufficient to meet the numerosity requirement.

■ Where the number of class members exceeds forty, and particularly where class members number in excess of one hundred, the numerosity requirement will generally be found to be met. 3B Moore's Federal

Practice, ¶ 23.05[1] (2nd ed. 1948). The specific requirement that the class be so numerous that joinder of all members is impractical does not mean that joinder must be impossible, but rather means only that the court must find that the difficulty or inconvenience of joining all members of the class makes class litigation desirable. *See e. g., Harris v. Palm Springs Alpine Estates, Inc.,* 329 F.2d 909, 913–914 (9th Cir. 1964). Thus, the fact that all class members in the present action are known and could be joined in the action is not determinative. The Court finds that joinder would clearly be impractical due to the large number of defendants. Joinder would necessitate individual representation which would be financially burdensome to the underwriter defendants and burdensome to the Court in the trial of the action. Joinder would pose a further financial burden on all parties to the action by requiring the preparation and service on each of the underwriter defendants a copy of every paper filed in the case.

In *In re Gap Stores, supra,* the court found that a class of ninety-one underwriters met the numerosity requirement. The court reasoned that "[w]hen the number of parties to be joined reaches the point of eliminating individual influence over pleading, discovery and litigation strategy then joinder cannot be considered a reasonable alternative to class adjudication. . . . The only way this court could join ninety-one new parties would be to require that the litigation be conducted through committees, that is, to make joinder a fiction for class adjudication." *In re Gap Stores, supra,* 79 F.R.D. at 302.

The Court finds the numerosity requirement to be met.

### 2. *Commonality.*

It is clear from the earlier discussion of the issues and proof that arise in determining whether there has been a violation of section 11 that there are sufficient common questions of law and fact to satisfy the commonality prerequisite of Rule 23. For the plaintiffs to prove a prima facie case against the underwriters, they must estab-

lish that each Registration Statement and Prospectus contains misrepresentations or omissions, that is, that each states untrue statements of material fact or fails to state material facts required to be stated. The interest of all the underwriters in each class in defending against proof of this prima facie case is identical. Further common factual and legal issues are the affirmative defenses of the due diligence of the lead underwriter (Blyth), and whether plaintiffs purchased the securities with knowledge of the untruths or omissions. *See In re Gap Stores, supra,* at 302. Finally, there is the common issue of whether the decline in value of the securities was due to the untruths or omissions. These common questions of law and fact satisfy the commonality prerequisite to certifying the defendant classes.

### 3. *Typicality.*

All underwriters of each class will have three typical and identical defenses: (1) that the Registration Statement and Prospectus contains no untruths or omissions, (2) that the lead underwriter acted with due diligence, and (3) that plaintiffs purchased their securities with knowledge of the untruths or omissions. These identical defenses satisfy the typicality requirement.

To the extent that the individual underwriters may be required to assert their personal due diligence defense, a factual defense exists that is not typical to each underwriter. However, this defense will not become operative at trial at least until the issues of whether there are untruths or omissions in the Registration Statement and Prospectus, and whether the lead underwriter acted with due diligence, are resolved in favor of the plaintiffs. Thus, this "untypical" defense does not dictate a finding that the Rule 23 typicality prerequisite is not met, the typicality requirement being satisfied by the important, typical defenses that will be litigated before an individual due diligence defense would need to be asserted. *See In re Gap Stores, supra,* 79 F.R.D. at 302–303. If the individual due diligence defense is to become an issue for trial, the Court, pursuant to its power to maintain a class action with respect to par-

ticular issues, F.R.C.P. 23(c)(4)(A), will order that this issue be tried after trial of the class issues.

### 4. *Adequacy of Representation.*

■ The prerequisite of adequacy of representation will be satisfied where the court is assured of vigorous prosecution (or defense), and where there is no conflict between the representative of the class and the other class members. *In re Gap Stores, supra,* 79 F.R.D. at 303. Thus, if the court believes that the representative class members are represented by qualified counsel, and that the named class members have common interests with, and no antagonistic interests against, fellow class members, the adequacy of representation requirement is met. 7 C. Wright & A. Miller, Federal Practice & Procedure, § 1770, p. 658 (1972).

In the present case, vigourous defense by Blyth is assured. Blyth is represented by highly qualified counsel. Additionally, as lead underwriter for both offerings and as a subscriber to 21% of the 9⅝% offering and 20% of the 10½% offering, Blyth has a major financial stake in this litigation,[3] and this assures a vigorous defense. The interest of Blyth in defending against this litigation is identical to the interests of the other underwriters sued as defendants, and, as discussed earlier, all underwriters have three important defenses in common. Because Blyth is the lead underwriter, there is no hint of any antagonism between Blyth and the other underwriters. In fact, it appears that in defense of itself Blyth will automatically defend the interests of all the underwriters. If facts are later discovered that would indicate antagonism between Blyth and the other underwriters, the Court retains the power to change the representative for the class, decertify the class, or in some other manner alter or amend the class. *See* F.R.C.P. 23(c)(1).

In *In re Gap Stores,* the court found that the two managing underwriters, who collectively underwrote 25% of the offering, were proper class representatives who would fairly and adequately represent the interests of the class. The court reasoned: "[b]oth managing underwriters will vigorously prosecute this action because they have a substantial interest in the outcome of the litigation and because they are represented by able counsel. Furthermore, the potential conflicts will not defeat class certification . . . . the conflicts are insignificant when compared with the issues uniting the class and can be eliminated by a separate proceeding when, and if, liability is adjudged." 79 F.R.D. at 305.

This Court also finds these considerations persuasive in determining that the adequacy of representation prerequisite has been met.

The Court notes that the Agreement Among Underwriters for both offerings designates Blyth as the representative of all underwriters, and authorizes Blyth to defend any suit brought against the underwriters for untrue statements, misrepresentations or omissions in each Registration Statement and Prospectus. (6(b) of Agreement Among Underwriters for each offering). The Agreements also authorize Blyth to take legal action on behalf of all underwriters, such as entering into a settlement agreement, and provide for contribution from the participating underwriters for expenses and damages incurred in defending a lawsuit. (6(b)(c) of Agreement Among Underwriters for each offering). This language in the agreements is very "classlike": it defines the underwriters as a class with Blythe as the representative of the class. The agreement indicates that the underwriters have agreed ahead of time that Blyth is a proper and adequate representative of their interests in the event of litigation.

The Court finds the adequacy of representation prerequisite of Rule 23 to be met.

*Satisfaction of 23(b)(3).*

As noted earlier, plaintiffs seek certification of defendant underwriter classes to

---

**3.** Blyth was by far the largest subscriber to both offerings. The next largest subscriber to the 9⅝% offering subscribed to 1,800 units, or 1.8% of the total offering. The next largest subscriber to the 10½% offering subscribed to $1.5 million of the debentures, or 2% of the total offering.

litigate their § 11 claims pursuant to subsection (b)(3) of Rule 23. Thus, the Court must find that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fair and efficient adjudication of the controversy." F.R.C.P. 23(b)(3).

As previously discussed, questions common to the classes predominate over questions affecting only individual class members. Three important common issues are whether the registration statements or prospectuses contain misrepresentations or omissions, whether Blyth acted with due diligence, and whether plaintiffs had purchased their securities with knowledge of the misrepresentations or omissions. The only significant individual issue is the due diligence of the individual underwriters, an issue which may never arise during the litigation. Even the issue of damages can to an extent be treated as a class issue because of the underwriters' joint and several liability to all plaintiffs, and because the underwriters may want to prove that the securities decreased in value for reasons other than the misrepresentations or omissions in the registration statements or prospectuses.

Thus, questions of law and fact common to members of the class clearly predominate over any questions affecting only individual members of the class. As individual issues do arise, the Court can order that these issues be tried after the trial of class issues. If necessary, the Court can alter the class structure by creating subclasses, or can decertify the classes.

As to the superiority of proceeding by class action requirement, the court in *In re Gap Stores* emphasized the economies of class litigation to the underwriters by a group defense and the "[s]ignificant judicial economies ... achieved by one rather than ninety-one determinations of such common questions as whether the registration statement contained a material misrepresentation," despite the fact that the court stated

that it could later be faced with ninety-one separate determinations of individual underwriter due diligence. 79 F.R.D. at 305. For similar reasons, this Court finds that class treatment is the superior method of adjudicating the section 11 action. The economic savings to the underwriters, in fact to all parties, was earlier discussed (in connection with the numerosity requirement). Judicial economy will be greatly served by having only two actions to determine common questions. Otherwise, the Court is potentially faced with 217 actions, (104 identical actions and 113 identical actions) litigating these common issues.

The Court finds Rule 23(b)(3) to apply to the § 11 actions.

*§ 11 Conclusion.*

■ For all the above reasons, the Court finds that class certification of two defendant classes of underwriters, a class of underwriters for each offering, is appropriate for determining the liability of the underwriters accused of violating § 11 of the Securities Act of 1933. The Court is in disagreement with Blyth's contention that the Court should only certify the classes as to those issues where the interests of the underwriters are identical. It is premature at this time to establish what issues will and will not be tried as class issues as to the § 11 action. As noted earlier, the individual issue of due diligence of each underwriter may never require litigation. At such time when individual legal or factual issues arise, the Court will exercise its power to modify the class, decertify the class, or order that individual issues be tried separately from class issues.

Thus, the Court grants plaintiffs' motion to certify a class of the 9⅝% underwriters and a class of the 10½% underwriters, with Blyth as the representative of both classes, for purposes of litigating alleged violations of § 11 of the 1933 Act.

CERTIFICATION OF DEFENDANT CLASSES FOR PURPOSES OF LITIGATING THE § 12(2) CAUSES OF ACTION

Plaintiffs seek certification of classes of defendant underwriters of the 9⅝% and

10½% offerings for purposes of determining one issue necessary to establishing a violation of § 12(2) of the 1933 Act. Certification is claimed to be proper under subsection (b)(1) of Rule 23. Again, the Court will first discuss the nature and range of proof necessary to establish, or escape, liability under § 12(2) before discussing the requirements of Rule 23.

*Issues and Proof Under § 12(2).*

Section 12(2) of the Securities Act of 1933 (15 U.S.C. § 77*l*(2)) provides:

Any person who—

       *     *     *     *     *     *

(2) offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

Although plaintiffs seek certification of defendant classes of underwriters alleged to have violated § 12(2) for purposes of litigating one issue only, the Court finds it necessary to discuss all issues which generally arise when litigating a § 12(2) violation in order to later discuss the Rule 23 requirements.

█ For plaintiffs to make out a prima facie case under § 12(2) they must prove: (1) an offer or sale of a security, (2) by the use of any means of interstate commerce, (3) through a prospectus or oral communication, (4) which includes an untrue statement of a material fact or omits to state a material fact. *See Gridley v. Sayre & Fisher Co.,* 409 F.Supp. 1266, 1272–1273 (D.S.D.1976). The fourth element of plaintiffs' prima facie case is identical to plaintiffs' prima facie case requirement under § 11 that the Registration Statement and Prospectus contain an untrue statement of a material fact or omit to state a material fact. *Emmi v. First-Manufacturers National Bank, supra,* 336 F.Supp. at 635, *and see* § 11(a). Plaintiffs also have the burden of proving that they did not know of the untrue statements or omissions when they purchased the securities. *Gilbert v. Nixon,* 429 F.2d 348, 356 (10th Cir. 1970).

█ Once this showing has been made by plaintiffs, defendants can escape liability under the statute by proving the affirmative defense that the defendants did not know, and in the exercise of reasonable care could not have known, of the untruth or omission. *Gilbert v. Nixon, supra,* 429 F.2d at 357; *Gridley v. Sayre & Fisher Co., supra,* 409 F.Supp. at 1273.

Because a violation of § 11 is nearly identical to a violation of § 12, a purchaser of securities allegedly defrauded by statements in a Registration Statement and Prospectus will usually allege a cause of action for violation of both § 11 and § 12(2) in the securities fraud complaint, as was done in the present case. However, even if the plaintiff can establish liability under both sections, the remedies of § 11 and § 12(2) are not cumulative, and at judgment the plaintiff must elect whether to seek damages under § 11 or § 12(2). III L. Loss, Securities Regulation, 1700, n.46 (2 ed. 1960). A plaintiff will generally elect to recover under § 12(2) because this section provides a recissionary measure of damages by awarding the purchaser the consideration paid for the security plus interest (less any income received on the security) upon tender of the security. If the purchaser no longer owns the security, § 12(2) provides for recovery of damages.

As discussed earlier, the damages awarded for a violation of § 11 are more limited. Pursuant to § 11, the amount of damages is the difference between the amount paid for the security and the value of the security at specified times. Further, plaintiffs' damages are limited to the amount at which the security was offered to the public (§ 11(g)) and each individual underwriter can only be required to pay out damages up to the amount of the total price at which the securities underwritten by him and distributed by him to the public were offered to the public (§ 11(e)).

Although the measure of damages provided under § 12(2) is more favorable than those to be recovered under § 11, defrauded security purchasers find it more difficult to prevail under § 12(2) because of that section's "privity" requirement. This "privity" requirement is contained in that part of § 12(2) which states that a person who offers a security under the stated fraudulent conditions "shall be liable to the person purchasing such security from him." This provision of § 12(2) is in sharp contrast to the imposition of liability under § 11 to all underwriters of the security, and the provision of § 11 for joint and several liability for all those found to have violated the section.

Professor Loss has summarized that "§ 12 contemplates only an action by a buyer against his immediate seller," although there are certain exceptions to this privity requirement. VI L. Loss, Securities Regulation (Supp. to 2d ed. 1969) 3840. The federal courts have given differing interpretations of the privity requirement, some interpreting the section to require strict privity and others giving the privity requirement a less restrictive interpretation.

It is the general rule that in the absence of some "special relationship," courts consistently hold the absence of buyer-seller privity to be "fatal to a claim based on § 12(2)." *Collins v. Signetics Corp.*, 443 F.Supp. 552, 555 (E.D.Penn.1977); *aff'd.* 605 F.2d 110 (3rd Cir. 1979). Thus, the purchaser can recover only from his immediate seller. The "special relationships" which have been developed as exceptions to the privity requirement, which most courts have adopted in full but which some courts have adopted only in part or have rejected, attach liability under § 12(2) "to persons acting as the immediate seller's agent, to defendants who are alleged to be controlling persons of the immediate seller, and to those who have actively participated in the fraudulent sale, either as an aider and abettor or as a co-conspirator." *de Bruin v. Andromeda Broadcasting Systems*, 465 F.Supp. 1276, 1280 (D.Nev.1979) (and citations therein).

The agency exception to the privity requirement is governed by ordinary agency principles. For a defendant not in privity with the plaintiff purchaser to be held liable under § 12(2) because of defendants "control" of the immediate seller, plaintiff must invoke the "control provision" of the 1933 Act. This provision is set forth in § 15 (15 U.S.C. § 77o) of the 1933 Act.[4] If the plaintiff can show that the defendant controlled the immediate seller, and the immediate seller is liable under § 12 of the Act, this controlling defendant and the controlled immediate seller will be jointly and severally liable to the plaintiff. *See Winter v. D. J. & M. Investment and Construction Corp.*, 185 F.Supp. 943, 946 (S.D.Cal.1960). Control has been defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or

---

4. Section 15 (15 U.S.C. § 77o) provides:

Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under §§ 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

otherwise." *Winter v. D. J. & M. Investment and Construction Corp., supra*, 185 F.Supp. at 947, citing 17 C.F.R. 230.405.

It is well settled that a defendant who is not an immediate seller but who has actively participated in the sale of securities as an aider or abettor or as a conspirator may be liable under § 12(2) of the Act though not in strict privity with the plaintiff. *Brick v. Dominion Mortgage & Realty Trust*, 442 F.Supp. 283, 306 (W.D.N.Y.1977) (and citations therein). To be held liable as an aider and abettor or as a co-conspirator the plaintiff "would have to establish that Defendant had knowledge of a fraudulent scheme or acted so recklessly that knowledge may be imputed to him." *de Bruin v. Andromeda Broadcasting Systems, supra*, 465 F.Supp. at 1280; *and see Stern v. American Bankshares Corp.*, 429 F.Supp. 818, 826 (E.D.Wis.1977).

A thorough discussion of the exceptions to the § 12(2) privity requirement is set forth by the court in *In re Ceasars Palace Securities Litigation*, 360 F.Supp. 366 (S.D.N.Y.1973); *cf. McFarland v. Memorex Corp.*, 493 F.Supp. 631, · 647· 648 (N.D.Cal.1980). The court held that "persons who do no more than conspire in or aid and abet a violation" of § 12 can be subject to liability under § 12(2), and that an allegation of conspiracy in the complaint is sufficient to bring the controversy within the purview of § 12(2). *Id.* at 378, 382. In defining who may be liable under the aiding and abetting and conspiracy exception, the court stated:

> Persons participating directly in a violation of the statute will not escape liability under the express language of the Act; similarly, those persons who are aware of and, to some lesser degree, participate in a violation of the securities laws and either enter into an agreement with or give assistance to the primary wrongdoer should not be permitted to escape the imposition of liability. *Id.* at 383.

Thus, if the defendant acted knowingly or recklessly in providing aid to or assistance in the wrongful conduct which violates § 12(2), the defendant will be liable as an aider and abettor or as a conspirator under § 12(2). *Id.; and see Brick v. Dominion Mortgage & Realty Trust, supra*, 442 F.Supp. at 306.

The *Ceasars Palace* court, and most other courts, refused to adopt a broad interpretation of § 12 which would hold that all those who participated in the events leading up to the allegedly fraudulent sale are liable under § 12(2). However, this interpretation could be adopted in the future given the purpose and goals of the Securities Act. *In re Ceasars Palace Securities Litigation, supra*, 360 F.Supp. at 379; *and see Hill York Corp. v. American International Franchises, Inc.*, 448 F.2d 680, 692–693 (5th Cir. 1971).

The Court will now discuss the Rule 23 requirements for certifying defendant classes for purposes of litigating the alleged violations of § 12(2) in light of this discussion of the issues that arise and the proof that is necessary to establish a violation of § 12(2).

## RULE 23 REQUIREMENTS.

### The Four Prerequisites

#### 1. Numerosity.

The numerosity considerations applicable to certification of defendant classes for purposes of § 11 litigation are equally applicable to the question of certification of defendant classes for purposes of § 12(2) litigation. Thus, referring to this earlier discussion, the Court finds that the numerosity prerequisite to class certification is met by the defendant classes consisting of 104 and 113 underwriters, respectively.

#### 2. Commonality.

The issue for which plaintiffs seek defendant class treatment—whether there were untrue statements or omissions in each Registration Statement and Prospectus that are materially misleading—is certainly a common issue to all defendant underwriters in each class. All four elements of plaintiffs' prima facie case involve questions of fact common to all members of the defendant classes and require a defense

common to all members of the defendant classes. Therefore, the Court is satisfied that the commonality prerequisite to class certification is met.

### 3. and 4. *Typicality and Adequacy of Representation.*

The defenses of each defendant underwriter class to the question of whether each Registration Statement and Prospectus contains any untruths or omissions that are materially misleading are defenses typical and identical to all underwriters. The defenses against plaintiffs' prima facie case is typical to all the underwriters. This would ordinarily be sufficient to satisfy the typicality requirement.

The quality of Blyth's counsel, Blyth's stake in this litigation, and the absence of antagonism or conflict between Blyth and all other underwriters in defending the issue for which class certification is sought, would ordinarily be sufficient to satisfy the adequacy of representation requirement.

However, Blyth asserts that certain rules developed by the Ninth Circuit apply to class certification of a § 12(2) action, and these rules prohibit the making of the ordinary determination that the typicality and adequacy of representation prerequisites to class certification are met, and in fact prohibit a finding that these two prerequisites are met in the present case. Briefly stated, the Ninth Circuit holds that, absent specified conditions, typicality and adequacy of representation are lacking and so a class cannot be certified where every plaintiff class representative in an action does not have a claim against every defendant in the action. Thus, assert defendants, because § 12(2) requires privity, each plaintiff has only a cause of action under § 12 (2) against his immediate seller, and not against all the underwriters. Therefore, because each plaintiff does not have a cause of action against each defendant underwriter, class certification cannot be granted.

The case to articulate these Ninth Circuit rules was *La Mar v. H. & B. Novelty & Loan Company,* 489 F.2d 461 (9th Cir. 1973). The *La Mar* case was a consolidated appeal of two separate actions. In the first, a class action was brought against all Oregon pawnbrokers by all customers of these pawnbrokers alleging violations of the Truth-in-Lending Act. *Id.* at 462. The plaintiff class representative had done business with only one of the defendant pawnbrokers. *Id.* The district judge had determined that the action was a proper plaintiff class action and certified the plaintiff class.

In the second action, a class action was brought against eight air carriers for overcharges. The action was brought on behalf of all persons who had suffered similar overcharges by these carriers; the plaintiff class representative had dealt with only two of the air carriers. *Id.* The lower court dismissed the complaint against the other six air carriers on the ground that plaintiff had no dealing with, and suffered no injury from, these carriers. *Id.* at 463.

The Ninth Circuit reversed the order of the district court in the pawnbrokers case and dismissed the action against all pawnbrokers the representative plaintiff had not dealt with. The court affirmed the dismissals made by the district court in the air carriers case. The court viewed its task in these appeals to reach an accommodation between the judicial and administrative process, stating that "the courts should not be available to those who have suffered no harm at the hands of them against whom they complain." *Id.* at 464.

In addressing the typicality prerequisite the court found typicality to be lacking "when the representative plaintiff's cause of action is against a defendant unrelated to the defendants against whom the cause of action of the members of the class lie." *Id.* at 465. Thus, the claims or defenses of the representative plaintiffs cannot be typical of the claims or defenses of the class unless these named plaintiffs have a cause of action against each and every defendant.

As to the prerequisite of adequacy of representation the *La Mar* court stated:

"a plaintiff who has no cause of action against the defendant cannot 'fairly and adequately protect the interests' of those

who do have such causes of action. This is true even though the plaintiff may have suffered an identical injury at the hands of a party other than the defendant and even though his attorney is excellent in every material respect." *Id.* at 466.

Representation on behalf of the class cannot be found to be adequate unless the class representative has a claim against every defendant alleged to have done some injury to any member of the class.

It is readily apparent that the rules set forth in *La Mar* substantially restrict the availability of class action treatment in many cases. However, the court articulates some exceptions to these restrictive rules. The court stated that the rules it set forth do not "embrace situations in which all injuries are the result of a conspiracy or concerted schemes between the defendants at whose hands the class suffered injury. Nor ... [are they] intended to apply in instances in which all defendants are juridically related in a manner that suggests a single resolution of the dispute would be expeditious." *Id.* at 466, fn. omitted. In summary then, unless the proponent of the class action can allege a conspiracy or concerted scheme among the defendants, or unless juridical links exist that make class resolution of a dispute expeditious, class treatment is not proper unless each plaintiff class representative has a cause of action against each defendant, even though the plaintiffs were all injured by a method of dealing common to all defendants.

*La Mar* presents a serious hindrance to findings of typicality and adequacy of representation where class treatment is sought to litigate a violation of § 12(2). As discussed earlier, liability under § 12(2) is ordinarily restricted to the immediate seller of the defrauded purchaser. If none of the exceptions to this § 12(2) privity requirement are applicable, i. e., control, agency, aiding and abetting or conspiracy, each plaintiff class member would only have a cause of action against his or her immediate seller. There are no allegations in the present complaint that each plaintiff class representa-

tive purchased his or her securities from each and every one of the underwriters, nor is such a situation of remote likelihood. Therefore, unless an exception to § 12 (2) is alleged, or unless an exception recognized by the *La Mar* court is alleged, i. e., conspiracy or a juridical relationship which suggests that class treatment of the underwriters would be expeditious, class certification as to the § 12(2) action would have to be denied pursuant to *La Mar* because each plaintiff class representative does not have a § 12(2) cause of action against each defendant underwriter.

*La Mar* addressed the propriety of certifying a *plaintiff* class, and its rules are articulated from this perspective. The statements and conclusions made by this Court in the preceding paragraph analyze the propriety of class treatment in litigating a § 12(2) cause of action from the plaintiff class perspective. In the present case, it has already been ordered by another judge of this court that this action proceed as a plaintiff class action. Though Blyth opposed plaintiff class certification, Blyth has not asked for reconsideration of this order, nor has Blyth yet moved that this court amend the class certification order as to the § 12(2) claims. What Blyth has done is assert that defendant class certification of the § 12(2) issue is improper under *La Mar* because there can be no finding of typicality or adequacy of representation, but Blyth cites to *La Mar* and discusses its rules from this same plaintiff class perspective.

Although the question has received little discussion, the rules of *La Mar* apparently should be applied to defendant class certifications. But the Court disagrees that the issue to be framed in determining whether defendant class certification is proper is identical to the issue framed when determining whether plaintiff class certification is proper. It would seem that when applying the *La Mar* rules to defendant class certification, the question is whether the representative defendant is subject to liability to every plaintiff. The focus must be on the defendant representative because the

questions of typicality and adequacy of representation respond to the typical nature of this defendant's defenses and the adequacy of this defendant's representation to the defendant class. Though the *La Mar* court was apparently motivated to make its restrictive rulings by the perceived need to curb massive class actions and to give more deference to the administrative function (*id.* at 489), changing the *La Mar* perspective to focus on the defendant class representative when determining the propriety of defendant class certification will properly assure the representation of absent class members required by due process considerations. Thus, under *La Mar*, if the representative defendant is subject to liability to all plaintiffs, the interests of the absent defendant class members will be represented during the class litigation.[5]

The exceptions to *La Mar*, however, (conspiracy or juridical links), should apply to defendant class certification as they do to plaintiff class certification. Thus, if defendants engaged in a conspiracy or common scheme, the restrictive rules of *La Mar* do not apply because the representative defendant, and in fact all defendants, are subject to liability to all plaintiffs. Likewise, if the defendants are juridically related in a manner that makes a single resolution of the dispute expeditious, *La Mar* does not prohibit defendant (or plaintiff) class certification.

In the present action plaintiffs allege only that they "purchased" their securities, there is no allegation from whom each plaintiff purchased. Thus, given the privity requirement of § 12(2) it is apparent that Blyth, the class representative, was not the immediate seller of the securities purchased by each plaintiff, and so Blyth is not subject to liability to each plaintiff. Thus, unless an exception to § 12(2) privity or an exception to *La Mar* applies, *La Mar* prohibits defendant class certification to litigate the § 12(2) claims because the prerequisites of typicality and adequacy or representation are not satisfied because Blyth is not subject to liability to all the plaintiffs. Also, some plaintiffs have causes of action under § 12(2) against some defendants, but all defendants are not liable to all plaintiffs.

It is possible that plaintiffs could have avoided a *La Mar* problem in the drafting of the complaint. Though there is indication to the contrary in this district (*McFarland v. Memorex Corp., supra*, 493 F.Supp. at 647-648), some courts hold that mere allegations of control,[6] agency, conspiracy or aiding and abetting sufficiently side-step a privity problem. *See e. g., In re Ceasars Palace Securities Litigation, supra*, 360 F.Supp. at 378, 382. These allegations, supported by the facts and circumstances underlying the allegations, may well be sufficient to avoid a privity or *La Mar* problem. However, no such allegations have been made in this complaint,[7] nor do any facts

5. Some courts and commentators have suggested that *La Mar* does not permit bilateral class actions. *See e. g.,* 7 C. Wright & A. Miller, Federal Practice & Procedure, § 1766 at 183 (Supp.1980). However, the Ninth Circuit has not confirmed this, and it would appear that if each plaintiff class representative had a cause of action against each defendant class representative, the requirements of *La Mar* would be satisfied. Obviously, such a situation is highly unusual and *La Mar* does severely restrict the possibility for class actions in any case where all defendants are not jointly and severally liable to all plaintiffs. But this restrictive interpretation of the limited situations where a bilateral class action is permissible will not be applicable where one of the specific exceptions to the rules of *La Mar* exist. These exceptions are: (1) a conspiracy among all defendant class members or (2) the existence of a

juridical relationship that makes class treatment of the action expeditious.

6. Plaintiffs assert in ¶ 2 of the Complaint that liability against the defendants arises under § 15 of the 1933 Act, which is the "control" provision of the Act. However, no allegation of control is ever made in the complaint. Thus, plaintiffs have not invoked the control exception to the § 12(2) privity requirement.

7. Plaintiffs do make extensive allegations of conspiracy and aiding and abetting in connection with their § 10(b), Rule 10b-5, fraud and deceit, and negligence claims. But these allegations are directed only against Itel, the individual defendants (the officers and directors of Itel), the accountant, and Blyth individually. (See ¶ 25, 26, 46 and 50 of the Complaint). That these allegations were not made

alleged in the complaint hint of a conspiracy between the underwriters or any aiding and abetting or control. Therefore, the Court must find the existence of 'juridical relationships which would suggest a single resolution of the dispute would be expeditious' (*La Mar, supra,* 489 F.2d at 466) in order to properly accord class treatment to the section 12(2) causes of action.

A "juridical relationship," often also called a "juridical link," refers to some type of legal relationship which relates all defendants in a way that would make single resolution of a dispute preferable to a multiplicity of similar actions. *Id.* at 470. What the *La Mar* court considered to be juridical links sufficient to maintain a class action where one would otherwise be impermissible was only briefly discussed by the court. The court merely discussed a few prior cases within which the court considered a juridical relationship sufficient to justify class treatment to exist. These cases involved class actions brought against state officials applying a common rule. Even though the plaintiff class representatives in each case did not have a cause of action against each defendant, the court reasoned that a "common rule applied by instrumentalities of a single state" presents a juridical link sufficient for maintaining an action as a class action. *Id.* There is no discussion in *La Mar* of other possible types of juridical links that make class treatment of an action proper.

Although the specific kind of juridical link discussed in *La Mar* is not present in this case, the Court finds that there are sufficient legal relationships, or juridical ·links, to permit ˙class treatment of the § 12(2) actions. The Court finds this conclusion to be especially compelling considering the great judicial convenience and economy which class certification would serve in the present case.

An important legal relationship uniting the defendant underwriters and ˙justifying class treatment of the § 12(2) actions is that the underwriters of each proposed class are already united as a class for purposes of litigating the § 11 actions. The Court has determined that classes of defendant underwriters are proper for litigating plaintiffs' § 11 claims. The subject matter of the § 11 litigation will involve the same two registration statements and prospectuses that will be involved in § 12(2) litigation. The underwriter defendants against whom liability is asserted under § 11 are the same underwriter defendants against whom liability is asserted under § 12(2) (though admittedly each defendant who is found to be liable under § 12(2) will only be liable to those plaintiffs to whom each underwriter acted as an immediate seller). Thus, this juridical relationship, that the defendant underwriters are already related together as a class for litigation of § 11 claims, justifies class treatment of the § 12(2) claims.

Class treatment of the § 12(2) claims is clearly the most expedient way in which to try the claims, and greatly furthers the interests of judicial economy. The issue sought to be certified for class treatment under § 12(2) is identical to the first issue to arise in the § 11 action, this issue being whether each Registration Statement and Prospectus contains untruths or omissions which are materially misleading. As the *plaintiffs* will proceed as a class in litigating their § 11 and § 12(2) claims, and as the underwriters are certified as a class for the § 11 litigation, certifying the defendant underwriters as a class for the § 12(2) litigation will mean that the finder of fact will make only *one* determination whether each Registration Statement and Prospectus is misleading, and this determination will be binding on *all* class members. Otherwise, ˙ the district courts could conceivably be

---

against the defendant underwriters may have been due to mistake, due to the position of the court in *McFarland v. Memorex Corp.,* or because plaintiffs believed that there was no proof to support such allegations. Although under the Federal Rules the Court is to liberally

construe the pleadings, it is clear from the complaint that these allegations are not meant to apply to the underwriters. Thus, the Court concludes that plaintiffs have not made allegations of ·conspiracy or aiding and abetting applicable to the underwriters.

faced with having to determine this issue over one hundred separate times if the plaintiffs decide to pursue § 12(2) remedies against each "immediate seller" underwriter.[8] Thus, it is indisputable that defendant class treatment as to one issue under § 12(2) is the most manageable, expeditious and convenient way to proceed in this complex litigation.

It should be noted that the policy behind requiring typicality and adequacy of representation for certifying a class action is carried out through the juridical relationship that defendant underwriters are already related as a class under § 11. Typicality and adequacy of representation are assured because the defenses which Blyth will be asserting in defending the issue of whether each Registration Statement and Prospectus contains untruths or omissions are identical for both § 11 and § 12(2), and because as Blyth defends against this issue, not only will it automatically be defending all the underwriters, it will also automatically be defending against both the § 11 and § 12(2) claims.[9]

Plaintiffs assert that the fact that all the underwriters of each offering sold the securities to the public pursuant to identical Registration Statements and Prospectuses, and the fact that all underwriters of each offering were parties to an Agreement Among Underwriters which established the rights and duties among the underwriters, are juridical links which make class certification of defendant underwriters under § 12(2) proper.

Recent cases have found certain agreements among defendants sufficient to find the Rule 23 prerequisites of commonality, typicality and adequacy of representation met and defendant class certification proper, even though each defendant was not subject to liability to each plaintiff. One such case is *United States v. Trucking Employers Inc.*, 75 F.R.D. 682 (D.D.C.1977). In this case, the court held that certification of the defendant class was appropriate in an action brought by minority workers to enjoin discriminatory practices of the trucking industry and to recover back pay for the employees discriminated against. The defendant class consisted of those trucking companies who are parties to or bound by the National Master Freight Agreement. *Id.* at 685. In finding the Rule 23(a) prerequisites met the court stated:

It must be emphasized that this is not simply a case in which the plaintiffs have attempted to lump together numerous unrelated or superficially-related firms on the theory that all of them engage in employment discrimination. In such a case a court might well conclude that any commonality is no more than illusion and is insufficient to justify class treatment. Here, each member of the defendant class provided an identical service, requires employees who possess identical skills, and utilizes identical job classifications. Perhaps most telling, each is party to the National Master Freight Agreement or its area supplements. These agreements bind the employment practices of the entire class in certain crucial respects . . . . Thus, these agreements serve a function

8. If a final judgment has been entered in the § 11 actions, the determination on the issue of untruths and omissions in the Registration Statements and Prospectuses will probably be conclusive in individual § 12(2) actions litigated after this judgment has been rendered. Of course, there would only be conclusive effect on those plaintiffs and underwriters who did not opt out of the § 11 class litigation. Despite such an apparent conclusive effect, the party sought to be bound by the judgment can argue that its effect should not be conclusive for various reasons, such as the issue was not litigated in a fair and efficient manner or sufficient notice was not given. 7A C. Wright & A.

Miller, Federal Practice & Procedure, § 1789 at 131–134 (Supp.1980). Thus, certification of defendant classes as to one issue arising under § 12(2) will serve judicial administration by preventing the anticipated disagreement between the parties to the individual actions of the res judicata, collateral estoppel or stare decisis effect of an earlier § 11 judgment on the merits.

9. *See* Note, "The Juridical Links Exception to the Typicality Requirement in Multiple Defendant Class Actions: The Relationship Between Standing & Typicality," 58 B.U.L.Rev. 492, 516–517 (1978).

analogous to that served by the statutes at issue in *Washington v. Lee* [263 F.Supp. 327] and *Gibbs v. Titelman* [369 F.Supp. 38] . . . [the former case was one of the cases discussed by *La Mar* in that court's brief explanation of a juridical link between defendants]. *First, the agreements delimit the defendant class. Indeed, this bond between the class members suggests to the court that in a practical sense they themselves have elected to become a "class." Second, the legality of certain provisions of these agreements is at issue in this case.*

*Id.* at 689–690. (Emphasis supplied).

The court concluded that "under these circumstances," the defendants are juridically related in a manner that suggests a single resolution of the entire dispute would be expeditious, citing *La Mar. Id.* at 690.

As to the first point made by the court in *Trucking Employers* it was discussed earlier that by the Agreement Among Underwriters, the underwriters seemed to set forth their own class, and the Agreement suggests to the Court that the underwriters have elected to become a class. Such an agreement among the underwriters suggests that it would be fair to treat the underwriters as a class for purposes of litigating misrepresentation in each Registration Statement and Prospectus. Such an agreement could be considered a sufficient juridical link to justify class treatment of this issue.

Plaintiffs seem to claim that the second point made by the court in *Trucking Employers* exists in the present case because all the underwriters of each class used the identical Registration Statement and Prospectus in marketing each offering, both containing materially misleading untruths and omissions.

Though this is not quite the same type of juridical link described by *Trucking Employers*, that each underwriter sold securities pursuant to the same Registration Statement and Prospectus does seem to be a juridical link and it can certainly be said that class treatment of the dispute would be expeditious. As the Registration Statement and Prospectus used for each offering is the same for each underwriter, the factual questions that will arise in determining whether each is misleading will be identical. No different facts would be asserted against any individual underwriter in determining this issue. Therefore, one determination of whether each Registration Statement and Prospectus is misleading is expeditious. Thus, the fact that the underwriters issued securities pursuant to an identical Registration Statement and Prospectus is a juridical link that suggests a single resolution of the dispute is expeditious, and justifies class treatment of one issue under the § 12(2) action.

For all of the above reasons, the Court finds that juridical relationships exist between defendant underwriters which make class adjudication of the issue of whether there were materially misleading untruths or omissions in each Registration Statement and Prospectus expeditious. Thus, the Court finds that *La Mar* presents no barrier to a finding that the prerequisites to class certification of typicality and adequacy of representation are met in the present case as to the defendant classes of underwriters.

As the Court has determined that all prerequisites set forth in section (a) of Rule 23 are met, the Court will now discuss the Rule 23(b) requirement.

*Satisfaction of 23(b)(1).*

Presumably because the court in *In re Gap Stores, supra,* denied class certification of a class of defendant underwriters for purposes of litigating a § 12(2) action under subdivision (b)(3) of Rule 23,[10] plaintiffs seek certification for purposes of litigating one issue arising under § 12(2) pursuant to subdivision (b)(1), stating that either clause (1)(A) or clause (1)(B) of that subdivision make class certification appropriate.

---

**10.** The court made this ruling because of the *La Mar* decision, but engaged in practically no discussion of whether any exceptions to *La Mar* could apply. *In re Gap Stores, supra,* 79 F.R.D. at 306–307.

The text of Rule 23(b)(1) bears repeating at this time. It provides:

(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests;

Subdivision (b)(1) provides for class treatment designed to address "[t]he difficulties which would be likely to arise if resort were had to separate actions by or against the individual members of the class." 1966 Advisory Committee Note to Rule 23(b)(1), set forth at 39 F.R.D. 69, 98, 100 (1966). It can be briefly summarized that clause (A) deals with the risk of separate adjudications to the party opposing the class, and that clause (B) deals with the risk of separate adjudications to individual members of the class. 3B Moore's Federal Practice 23.35[1] (2d ed. 1980). Rule 23(b)(1) can be restated as it applies to the present case as follows:

An action may be maintained as a class action where:

(1) the prosecution of separate actions against the underwriters individually would create a risk of

(A) inconsistent or varying adjudications with respect to the individual underwriters which would establish incompatible standards of conduct for the plaintiffs, or

(B) adjudications with respect to individual underwriters which would as a practical matter be dispositive of the interests of other underwriters not parties to the adjudications or would substantially impair or impede the ability of these underwriters to protect their interests.

In the Advisory Committee's Notes to clause (A) of subdivision (b)(1) it is stated that "[o]ne person may have rights against ... numerous persons constituting a class, and be so positioned that conflicting or varying adjudications in lawsuits with individual members of the class might establish incompatible standards to govern his conduct. The class action device can be used effectively to obviate the actual or vital dilemma which would thus confront" this party. Advisory Committee's Notes to Rule 23, *supra* at 100. The note concludes that an action against a class in such a situation would "provide a ready and fair means of achieving unitary adjudication." *Id.*

If defendant class certification as to § 12(2) claims is not granted in the present case, plaintiffs will be confronted with a dilemma which could most effectively be avoided by the class action device. As noted earlier, each plaintiff may pursue both § 11 and § 12(2) claims until judgment when the plaintiff will have to elect which remedy he or she will pursue. If defendant class certification is not granted as to the § 12(2) issue of the untruths or omissions in each Registration Statement and Prospectus, each plaintiff will be forced to maintain the class action as to the § 11 claim and an individual action against the immediate seller underwriter as to the § 12(2) claim. (Admittedly, many plaintiffs will be forced to abandon their § 12(2) claims due to the expense of bringing an individual action). Those plaintiffs who continue to pursue both actions may well be faced with different determinations in each action as to whether the Registration Statement and Prospectus is materially misleading. The jury in the class action could decide that there are no untruths or omissions and the jury in the individual action could determine that there are untruths or omissions, but they are not materially misleading, or that there are untruths or omissions that are materially misleading. Thus, each plaintiff could be subject to inconsistent or varying adjudications of the same issue.

As this issue is identical to both the § 11 and § 12(2) causes of action, defendant class treatment of this issue (required to be proved to establish both a § 11 and § 12(2) cause of action) would thwart this dilemma that would confront the plaintiffs, and would provide a fair and ready means of achieving a unitary adjudication of this issue.

The discussion of 23(b)(1)(A) in *La Mar, supra,* does not prohibit class treatment in this case as is claimed by Blyth. The language by the court as to a *plaintiff* class and the requirement of different courses of conduct of the *defendant* cannot be reconciled to apply to the present case. *See La Mar, supra,* at 466. Nor does *McDonnell Douglas Corp. v. U. S. District Court,* 523 F.2d 1083 (9th Cir. 1975), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976), prohibit class treatment under clause (1)(A) in this case. In that case the court held that subdivision (b)(1)(A) "was not intended to permit class actions simply when separate actions would raise the same question of law" and the separate actions could reach inconsistent results and inconsistent resolutions of the same question of law. *Id.* at 1086. But the situation that existed in *McDonnell* which was determined not to be encompassed by clause (1)(A) was that a judgment that a defendant was liable to one plaintiff would not require action inconsistent with a judgment that the defendant was not liable to another plaintiff. The court found no risk of inconsistency to exist because by paying the first judgment the defendant could act consistently with both judgments. *Id.* A quite different situation is presented here as the very same plaintiff would be suffering inconsistent adjudications on the same issue against the same defendant, rather than different plaintiffs suffering inconsistent adjudications. Thus, defendant class certification for purposes adjudicating the § 12(2) issue of whether each Registration Statement and Prospectus contains materially misleading untruths or omissions is permitted by subdivision (b)(1)(A).

Plaintiffs assert that a more compelling case for certification is presented under subdivision (b)(1)(B). The Advisory Committee's Notes to Clause (B) of subdivision (b)(1) states that the clause "takes in situations where the judgment in a nonclass action by or against an individual member of the class, while not technically concluding the other members, might do so as a practical matter. The vice of an individual action would lie in the fact that the other members of the class, thus practically concluded, would have no representation in the lawsuit." Advisory Committee's Notes to Rule 23, *supra,* 39 F.R.D. at 101–102. Thus, plaintiffs assert that a finding in one individual action that a Registration Statement and Prospectus was materially misleading would substantially impair the other underwriters from asserting a contrary position in other courts.

It was this line of reasoning that satisfied the court in *Lynch Corp. v. MII Liquidating Co.,* 82 F.R.D. 478 (D.S.D.1979), that a class of defendants should be certified for purposes of litigating an action under § 10(b) of the 1934 Act. The court explained that any liability imposed on representative defendants would effectively foreclose the unnamed defendants from defending their respective interests in another court. *Id.* at 483.

A number of courts have adopted the same line of reasoning as was adopted by the *Lynch* court and validate a class action even though the dispositive impact of an individual action will not as a matter of legal analysis necessarily dispose of other claims, because in the practical world of legal remedies *it will* dispose of other claims. 3B Moore's Federal Practice, *supra,* at 23.35[2], p. 23--282 (2d ed. 1980). By so doing, these courts bring "the interests of judicial administration into the balance" and will in appropriate circumstances "allow the practical need for a unified class remedy to override the individual rights of members to pursue their own actions." *Id.*

This Court agrees with this practical approach, and greatly appreciates the considerations of judicial administration in determining whether a class should be certified

pursuant to subsection (b)(1)(B). The case before this Court especially points out the need to make these considerations in determining whether to certify a class. If a Registration Statement and Prospectus is found to be materially misleading in an action against one or some of the underwriters, all other underwriters are, practically speaking, now precluded by the *stare decisis* effect of the adjudication from asserting that the statement is not misleading. And, perhaps more importantly, judicial administration would be greatly served by having a single determination of whether each Registration Statement and Prospectus is misleading. This is especially true since this determination will already be required to be made as against *all* underwriters under § 11. Judicial administration will be well served by having a single determination of the misleading character of each Registration Statement and Prospectus binding against all the underwriters for all § 11 and § 12(2) purposes.

But *La Mar* adopts the contrary position that the mere *stare decisis* effect of an individual adjudication is not enough as a practical matter to be dispositive of the interests of the other members. *See* 3B Moore's Federal Practice 23.25[2], p. 23–281 (2d ed. 1980). In *La Mar*, the court stated that if "the individual action inescapably will alter the substance of the rights of others having similar claims . . . the situation falls within Rule 23(b)(1)(B)." *La Mar, supra*, 489 F.2d at 467. The court explained that such a situation did not exist in the case before it because the success or failure of the individual class members in the individual actions will not "inescapably alter the rights of others similarly situated. Their claims are left untouched by separate actions. Neither the *stare decisis* consequences of an individual action nor the possibility of false reliance upon the improper initiation of a class action can supply either the practical disposition of the rights of the class, or the substantial impairment of those rights, at least one of which is required by Rule 23(b)(1)(B)." *Id.; and see Green v. Occidental Petroleum Corp.*, 541 F.2d 1335, 1340 (9th Cir. 1976); *McDonnell*

*Douglas Corp. v. U. S. District Court, supra*, 523 F.2d at 1086.

Thus, although *La Mar* prohibits this Court from certifying the one issue § 12(2) class pursuant to 23(b)(1)(B), the Court has earlier determined that certification under 23(b)(1)(A) is permissible. Therefore as the prerequisites of 23(a) have been met, and a provision of 23(b) has been met, the Court grants plaintiffs' motion to certify defendant classes of underwriters for purposes of litigating one issue arising under § 12(2). That issue is whether each Registration Statement and Prospectus contains materially misleading untruths or omissions.

The Court recognizes that by certifying § 12(2) defendant classes pursuant to subdivision (b)(1) of Rule 23, the defendants are not permitted to "opt-out" of the class action, as they will be permitted to do as to the § 11 classes since these classes are certified pursuant to subdivision (b)(3) of Rule 23. *See* Rule 23(c)(2)(C). The underwriters could look at the Court's orders as being unfair because they are not permitted to opt out of the § 12(2) class. The Court, however, does not find that the inability to opt out is a problem because it is unlikely that defendant underwriters would want to opt out of the § 11 classes because of the incredible economy found in a group defense. It is noted that each of these individual underwriters has a small financial stake in the litigation. Additionally, if certification under § 12(2) were not granted there would be a greater likelihood that individual underwriters would opt out of the § 11 class. Because the underwriters are exposed to a greater degree of liability under § 12(2), each underwriter may want to force the plaintiffs to bring both their § 11 and § 12(2) claims at one time, by opting out of the § 11 class, because each underwriter will have to individually defend against the misrepresentation issue as to the § 12(2) claim anyway.

As plaintiffs have stated in their Rebuttal Memorandum in Support of Motion for Defendant Class Certification at page 5 that they have no objection to sending notice to absent class members of the under-

writer classes, the Court will order plaintiffs to send notice of the action to *all* members of the underwriter classes and therefore avoid any due process problems due to lack of notice.

### § 12(2) Conclusion.

For all of the above reasons, the Court finds that class certification of two defendant classes of underwriters—a class of underwriters for each offering—is appropriate for determining the issue of whether each Registration Statement and Prospectus is misleading under § 12(2) of the Securities Act of 1933. Thus, the Court grants plaintiffs' motion to certify a class of the 9⅝% underwriters and a class of the 10½% underwriters, with Blyth as the representative of both classes, for the purposes set forth above.

*ORDERS:*

Good cause appearing therefor, the Court makes the following orders:

1. Plaintiffs' motion to certify a defendant class of underwriters of the 9⅝% offering for purposes of litigating violations of § 11 and one issue arising under § 12(2) is granted.

2. Plaintiffs' motion to certify a defendant class of underwriters of the 10½% offering for purposes of litigating violations of § 11 and one issue arising under § 12(2) is granted.

3. Plaintiffs are ordered to serve notice on all members of the defendant class of underwriters.

4. Plaintiffs shall dismiss all individual underwriters, except Blyth, from the action.

