In re ALEXANDER GRANT & CO.
LITIGATION.

This document relates to all actions.

Master File No. ESM I.

United States District Court,
S.D. Florida, N.D.

May 6, 1986.

Richard Smith, Steel, Hector & Davis, Miami, Fla., for American Savings & Loan Ass'n.

Richard E. Brodsky, Paul, Landy, Beiley & Harper, Miami, Fla., Alvin Stein, Robert M. Carmen, Parker Chapin Flattau & Klimpl, New York City, for defendant Grant.

Patricia M. Silver, Smith & Mandler, Miami, Fla., Laz Schneider, Fort Lauderdale, Fla., for First Federal Sav. & Loan of Big Spring, Tex.

James D. Adams, Quinton, Lummus, Dunwody & Adams, Miami, Fla., for Sun Federal Sav. & Loan Assn.

Jack Gillman, Hannoch Weisman, Roseland, N.J., for First Atlantic Sav. & Loan Ass'n.

Lawrence G. McMichael, Dilworth Paxson Kalish & Kauffman, Philadelphia, Pa., Richard B. Barkin, Dilworth Paxson, et al., Boca Raton, Fla., for County of Dauphin, Pa.

## ORDER

GONZALEZ, District Judge.

**THIS CAUSE** is before the court upon the Motions for Certification of a Defendant Class filed on behalf of the plaintiffs, American Savings and Loan Association of Florida, First Federal Savings and Loan Association of Big Spring, Texas, Sun Federal Savings and Loan Association and First Atlantic Savings and Loan Association (collectively "S & Ls") and County of Dauphin, Pennsylvania ("Dauphin").[1]

The issue presented is whether individual past and present partners of a national accounting firm being sued for alleged violations of federal securities and RICO laws, pendent state claims and common law claims should be certified as a defendant class.

This court answers yes.

The court commends the parties for their well-reasoned memoranda of law and arguments presented by able counsel.

## I. FACTUAL BACKGROUND

### A. ESM

This litigation arises from the ashes of an obscure government securities brokerage, E.S.M. Government Securities, Inc., and its subsidiaries and affiliates (collectively "ESM").[2]

In 1977, ESM commenced operations and was an active participant in the purchase and sale of government securities, term repurchase agreements and reverse repurchase agreements. Almost from its inception, however, ESM experienced substantial losses.

By March 4, 1985, ESM was insolvent. Audits revealed that it was without the necessary assets to meet over $300,000,000 in obligations. Accordingly, upon application of the Securities and Exchange Commission, a final judgment of injunction was entered against ESM by this court, and a receiver was appointed.

On March 26, 1985, the receiver filed an involuntary petition in bankruptcy against ESM.

On April 1, 1986, a federal grand jury sitting in Fort Lauderdale, Florida, returned a 44 count-Indictment against nine individuals including:

1. Ronnie R. Ewton—the former Chairman of the Board of E.S.M. Group and E.S.M. Government and President, Secretary and a Director of E.S.M. Financial;

2. George G. Mead—Executive Vice-President and a Director of E.S.M. Group, Vice-President and a Director of E.S.M. Financial and Vice-President, Treasurer and a Director of E.S.M. Government;

3. Nicholas B. Wallace—Vice-President and Secretary of E.S.M. Group, President and Secretary and Director of E.S.M. Government;

4. Charles W. Streicher—Vice-President and a Director of E.S.M. Group and Vice-President of E.S.M. Government;

5. Henry Earl Riddel—former Comptroller of various E.S.M. entities;

6. Thomas F. Saunders—a former E.S.M. employee;

7. Timothy R. Murphy—an E.S.M. employee in charge of the "Repo Desk";

8. Stanley Wolfe—an E.S.M. employee in charge of clearing operations;

---

1. Plaintiff, Marvin Warner, also filed a Motion for Certification of a Defendant Class. Warner's action was dismissed without prejudice, and an amended complaint was filed. His Motion, however, has not been renewed.

2. In this court alone, some 42 ESM-related cases are being litigated.

9. Jose L. Gomez—former partner of Alexander Grant and Company who was responsible for ESM audits and certifications of the year-end financial statements for E.S.M. Government.

The Indictment charged that the above individuals committed mail and wire fraud for the purpose of concealing and falsely reporting the financial condition of ESM. These acts were accomplished by preparing false and fraudulent journal entries and financial statements and sending the false financial statements to various customers to induce them to enter into transactions with ESM. Further, the defendants concealed excessive borrowing, overpledged collateral and issued false "safekeeping letters" to various customers.[3]

On April 17, 1986, all defendants appeared before this court. Ewton, Mead, Streicher, Saunders, Riddel, Murphy and Gomez admitted the allegations contained in the Indictment and pleaded guilty to certain counts. The government proffered facts supporting the Indictment—facts that were obtained not only from former ESM employees, victims and records but from personal interviews with the defendants. The court found the factual presentation sufficient to support the pleas and adjudged these defendants guilty.[4]

### B. Alexander Grant and Company

The collapse of ESM caused financial tremors throughout the nation. The losses incurred by numerous financial institutions, municipalities, counties, school districts and other public entities climbed into millions of dollars. Indeed, ESM's collapse triggered the failure of Home State Savings Bank and the near failure of Ohio's state-wide banking system.

Once ESM was placed under the protection of this district court sitting in bankruptcy, various creditors sought to recoup their losses by commencing suit against Grant Thornton, f/k/a Alexander Grant and Company ("Grant"), the national certified public accounting partnership responsible for preparing ESM's yearly financial statements, and Grant's past and present partners. To date, 20 actions against Grant and its individual partners alleging violations of federal securities and RICO laws as well as pendent state and common law causes of action are pending before this court. Owing to the possibilities of treble damages awards in each case, Grant's potential liability exceeds one-billion dollars.

The defendant, Jose Gomez, was a certified public accountant employed by and later a managing partner of Grant's Fort Lauderdale, Florida branch office from November 1976 until March 1985. During this period, Gomez was responsible for directing and controlling the auditing and tax services, including the certification of year-end financial statements for ESM. The financial statements, certified by Grant as having been conducted in compliance with generally accepted accounting standards, indicated that ESM was a healthy, prosperous organization. In fact, Gomez learned of ESM's true condition in 1980, confronted its principals and agreed to conceal ESM's substantial losses. In return for his cooperation and participation, Gomez received $200,000.[5]

### C. Alexander Grant & Co. Litigation

As stated previously, 20 Grant cases are pending before this court.

On July 20, 1985, the court entered its Omnibus Pretrial Order No. 1. The Order consolidated the cases into five (5) groups for purposes of pre-trial proceedings.

Thereafter, Grant filed its Motions to Dismiss which were argued on January 27,

---

**3.** A copy of relevant portions of the Indictment is attached as Appendix A.

**4.** The court is aware that certain defendants, including Jose Gomez, also were charged with similar violations by federal and state grand juries in the State of Ohio and will be pleading guilty.

**5.** These facts were alleged in the April 1, 1986 Indictment and were admitted to by Gomez on April 17, 1986.

1986. Among the many issues presented were (a) whether the complaints should be dismissed against individual partners who were not citizens of Florida for lack of personal jurisdiction, and (b) whether liability under federal and state law could be imposed upon an individual partner merely because of the activities of a co-partner. The plaintiffs correctly noted, and this court agreed, that as Grant elected to conduct itself as a partnership in Florida, the individual partners were subject to personal jurisdiction in Florida. Further, the court found that the causes of action for federal securities violations, federal and state RICO claims and state statutory and common law claims, when considered in light of general partnership liability, were sufficient to withstand the Motions to Dismiss. The court did dismiss claims asserted under Section 12(2) and Section 17(a) of the Securities Act of 1933 as well as the complaint of Marvin Warner.

The court also established the relevant time period for determining which past and present Grant partners could be subject to potential liability ("class period").[6] The determinations were premised upon the dates of financial statements or confirmation letters relied upon by plaintiffs. Partners who were outside the class period were dismissed from cases in which they were named individually. The court notes that in each case, over 300 past and present partners continue to be subject to potential liability.

On March 7, 1986, following a scheduling conference, the court set the cases for trial on the calendar commencing Tuesday, October 14, 1986. Additionally, a cut-off date of August 1, 1986, was set for discovery. By subsequent Order, the court determined that motions for partial summary judgment must be filed by May 15, 1986, and all other pre-trial motions must be served by July 31, 1986.

The court feels compelled to comment on the problems of plaintiffs, not parties to the Motions for Certification of Defendant Class, in effectuating service of process upon the individual partners. These plaintiffs initially attempted mail service pursuant to Rule 4(c)(2)(C)(ii) of the Federal Rules of Civil Procedure. For example, in the Receiver's Action, service by mail was attempted upon 470 Grant defendants. Only four (4) acknowledgments were completed and returned while six (6) mailings were returned as undeliverable. Approximately ten (10) other defendants were served personally, and their service was unsuccessfully contested by Grant. In the remaining cases, although approximately 300 Grant partners were sued, personal service has been effected upon only one-third of these individuals.

These plaintiffs have been frustrated by their inability to obtain personal service and have incurred substantial expenses in their futile attempts. The Receiver, in fact, sought this court's assistance by filing his Motion for Determination as to Mail Service. By separate Order, however, this court determined that absent the return and filing of the defendants' acknowledgments, mail service is insufficient. Thus, plaintiffs seeking to recover against individual Grant partners will be required to effect personal service upon these Grant partners.

The court, therefore, notes that although trial is scheduled to commence in six (6) months, only one-third of the potential defendants have been served properly.

## II. DEFENDANT CLASS CERTIFICATION

The S & Ls and Dauphin seek certification of a defendant class encompassing individuals who were Grant partners during previously established class periods. These plaintiffs argue that the proposed class members are jointly and severally liable for the actions of partners committed during the ordinary course of partnership business. This liability assertedly is unaffected

---

**6.** See, *Northwestern National Bank of Minneapolis v. Fox & Co.*, 102 F.R.D. 507, 509 (S.D.N. Y.1984).

by their knowledge, or lack thereof, of ESM and the facts surrounding its collapse. Further, as the potential damages may well exceed Grant's professional insurance coverage, the individual partners must be before the court to permit these plaintiffs access to personal assets. *Detrio v. United States,* 264 F.2d 658 (5th Cir.1958); *Fidelity and Casualty Company of New York v. Homen,* 116 So.2d 444 (Fla. 2d DCA 1959). See, Fla.Stat. § 48.061 (West 1969).

This court agrees that class certification is proper.

It is well established that class certification is applicable to both plaintiff and defendant classes pursuant to Rule 23(a) of the Federal Rules of Civil Procedure which provides that "[o]ne or more members of a class may sue or be sued as representative parties." *In re Greenman Securities Litigation,* 94 F.R.D. 273 (S.D.Fla.1982); *In re Itel Securities Litigation,* 89 F.R.D. 104 (N.D.Calif.1981). See, *Northwestern National Bank of Minneapolis v. Fox & Co.,* 102 F.R.D. 507 (S.D.N.Y.1984). Further, certification of defendant classes has gained considerable acceptance in securities fraud litigation. E.g., *Green v. Occidental Petroleum Corp.,* 541 F.2d 1335 (9th Cir.1976); *In re Activision Securities Litigation,* 621 F.Supp. 415 (N.D.Calif. 1985); *Weinberger v. Jackson,* 102 F.R.D. 839 (N.D.Calif.1984); *Northwestern National Bank of Minneapolis v. Fox & Co.,* 102 F.R.D. at 507; *In re Itel Securities Litigation,* 89 F.R.D. at 104; *In re Gap Stores Securities Litigation,* 79 F.R.D. 283 (N.D.Calif.1978).

Analysis of the facts and issues is now necessary for determination of whether the requisite elements for certification are met under Rule 23(a). The court will then determine the appropriate Rule 23(b) category under which the litigation will proceed.[7] The court is mindful of Grant's representations, during oral argument and in memoranda of law, that individual partners will

"opt-out" should certification be maintained under Rule 23(b)(3).

## A. Rule 23(a)

Rule 23(a), Fed.R.Civ.P., sets the threshold elements necessary for class certification. These elements are whether:

(1) the class is so numerous that joinder of all members is impracticable,

(2) there are questions of law or fact common to the class,

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and

(4) the representative parties will fairly and adequately protect the interests of the class.

### (1) Numerosity

In the S & Ls and Dauphin actions, the number of potential class members average 350 individuals who are located throughout this nation. Class certification has been ordered when the number of class members stood at far less than the potential class urged here. E.g., *In re Activision Securities Litigation,* 621 F.Supp. at 415 (150 class members); *In re Itel Securities Litigation,* 89 F.R.D. at 104 (113 class members); *In re Gap Stores Securities Litigation,* 79 F.R.D. at 283 (91 class members).

Grant maintains that the numerosity requirement is not fulfilled merely because the class exceeds 300 members. The court is not persuaded by Grant's authority and notes that its cases are out-of-step with more recent pronouncements on this issue.

Nor is this court persuaded by Grant's argument that the individual partners could be joined as other plaintiffs have attempted. As the *Itel Securities* court remarked

[t]he specific requirement that the class be so numerous that joinder of all members is impractical does not mean that joinder must be impossible, but rather means only that the court must find that

---

7. The S & Ls and Dauphin initially sought certification under Rule 23(b)(3). They subsequently adopted the position asserted by Warner that certification under either Rule 23(b)(1) or rule 23(b)(3) is appropriate.

the difficulty or inconvenience of joining all members of the class makes class litigation desirable. Thus, the fact that all class members in the present action are known and could be joined in the action is not determinative. The court finds that joinder would clearly be impractical due to the large number of defendants. Joinder would necessitate individual representation which would be financially burdensome to the underwriter defendants and burdensome to the court in the trial of the action. Joinder would pose a further financial burden on all parties to the action by requiring the preparation and service on each of the underwriter defendants a copy of every paper filed in the case.

89 F.R.D. at 112 (citations omitted).

The court has observed first hand the effects of joining more than 300 defendants. Joinder attempts in the other Grant actions have proven burdensome and impractical. These fruitless attempts have and will consume vast sums of money in the preparation and service of individual complaints upon partners. The attempts also consume this court's time by requiring resolution of individual service of process issues.

Further, in this instance, with over 300 potential class members, it is beyond question that individual influence over the course of this litigation has been eliminated. *In re Gap Stores Securities Litigation,* 79 F.R.D. at 302.

Thus, the court finds that the numerosity threshold is met.

### (2) Commonality

■ The plaintiffs maintain that the issues of fact and law are common to the proposed defendant class since the wrongful acts by Grant partners performed during the course of partnership business impose joint and several liability upon all partners. Grant argues that partnership liability does not extend to federal securities and RICO claims nor to the various state statutory and common law claims.

This is Grant's second-go-round, in this court, for its assertion that somehow individual partners are outside well established law relevant to partnership liability. Grant unsuccessfully raised this position in its Motions to Dismiss. The argument again is unsuccessful. See, *Fox & Co.,* 102 F.R.D. at 511–12.

Grant's argument that individual claims predominate because of the necessity for assessing damages based upon a partner's tenure is equally unpersuasive.

Courts generally focus on the liability issue in deciding whether the predominance requirement is met, and if the liability issue is common to the class, common questions are held to predominate over individual questions.

*Dura-Bilt Corp. v. Chase Manhattan Corp.,* 89 F.R.D. 87, 89, 93 (S.D.N.Y.1981).

As the S & Ls and Dauphin correctly note, once liability and the relevant dates are established, assignment of damages becomes a ministerial task.

Grant also asserts that the presence of state common law and statutory claims somehow thwarts a finding of commonality since these claims predominate. Again, the plaintiffs correctly direct this court's attention to the codification of the Uniform Partnership Act in all states but Louisiana. 6 Uniform Laws Ann. (1985 Pocket Part at 1). Further, the claims presented are based upon either federal law or upon causes of action available in Florida.

The court finds therefore that the requisite commonality is present. Should the acts of one partner be determined to be wrongful, his liability flows to all co-partners during the class period.

### (3) Typicality

■ The issue of whether the typicality threshold is reached is readily resolved. The claims arise from the same financial statements and other financial data produced by Grant which allegedly contained fraudulent information. Under partnership doctrine, liability can be imposed jointly and severally upon individuals who were partners during the class period. Thus,

individual defenses will be substantially similar. *Fox & Co.,* 102 F.R.D. at 513; *Thillens, Inc. v. Community Currency Exchange Association of Illinois, Inc.,* 97 F.R.D. 668 (N.D.Ill.1983).

■ The court also notes that individual questions regarding the apportionment of damages, if any, may require the formation of sub-classes. This possibility, however, does not preclude class certification. *Fox & Co.,* 102 F.R.D. at 513.

### (4) Adequacy of Representation

■ "[T]he standards for adequacy of representation are that the class representatives must be represented by competent counsel and that there must be no antagonism between the interests of the class representatives and class members." *In re Activision Securities Litigation,* 621 F.Supp. at 434. See, *Weinberger,* 102 F.R.D. at 844.

The court turns first to the proposed representatives with the knowledge that the proposed class members elected to join together to conduct business activities as a partnership. The proposed representatives include the executive partner of Grant selected by his co-partners as their chief executive officer and the managing partner selected by his co-partners to manage Grant's south Florida offices. All proposed representatives were partners throughout the class period.

The court notes again that Grant partners chose to join forces and conduct their business as a partnership. The partners selected the proposed class representatives for positions of leadership and management. Owing to this indicia of confidence placed in the proposed representatives, the court is assured of their ability to adequately represent the interests of their co-partners.[8]

Finally, the court turns to the adequacy of representation by counsel. Over the past year, the court has observed the performance of Grant's counsel. They have represented Grant aggressively without becoming obstreperous. Their written and oral presentations of complex and novel issues are competent, intelligent and concise. Grant's counsel have often stood alone against a host of equally competent opponents and have performed admirably. They have the available resources within which to adequately represent the interests of hundreds of individuals. Finally, counsel possess the restrained passion necessary to assure adequate legal representation.

Thus, class members unquestionably would receive adequate representation before this court.

### B. *Rule 23(b)*

Having determined that the proposed defendant class surpasses the threshold requirements of Rule 23(a), the court's attention turns to selecting the appropriate category within which the class shall proceed.

### (1) Rule 23(b)(3)

■ Rule 23(b)(3) provides that a class shall proceed under its provisions when

> the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Thus, to fall within this category, a class must satisfy a two-prong requirement: predominance and superiority.

### (a) Predominance

As demonstrated, *supra,* questions of law or fact predominate any questions affecting individual class members. Further, as noted by the *Fox* court, 102 F.R.D. at 514, the nationwide service of process provision under Section 27 of the 1934 Securities Exchange Act, 15 U.S.C.A. § 78aa (West 1981), subjects Grant partners to this court's *in personam* jurisdiction over both the federal, pendent and common law claims.

---

8. Grant again raises the issue of disparate positions. This issue is relevant only to the question of damages and can be resolved without interfering with predominate class claims.

This court cannot envision any individual questions regarding either liability or personal jurisdiction that would predominate the question of liability.

### (b) Superiority

Grant argues that a class action is not superior to other avenues for litigating the plaintiffs' claims. Identical arguments considered and rejected by the *Fox* court are reiterated here by Grant. *Id.* at 514-15.

Grant avers that certification under Rule 23(b)(3) would be a futile exercise. Partners would merely utilize their opt-out right provided in Rule 23(c)(2)(A). Further, Grant asserts that a mass opt-out is not a slight possibility but a strong probability. Thus, certification under Rule 23(b)(3) is not a superior avenue to travel.

Grant premises its position upon an unpublished Magistrate's Report in *In re Investors Funding Corporation of New York Securities Litigation*, M.D.L. Docket No. 290 (*Bloor v. Dansker*), 76 Civ. 4679 (WCC) (S.D.N.Y. Feb. 27, 1986) which was ultimately adopted by the district court. Certification under Rule 23(b)(3) was denied because of the likelihood of a mass opt-out of partners of national accounting firms sued for their alleged participation in fraudulent investment activities.

The *Bloor* case presented factual consideration not available *sub judice*. First, the statute of limitations was due to expire in less than two (2) years. Partners could escape liability by opting-out and then avoiding service of process. Additionally, the *Bloor* court surmised that partnership assets and assets of other defendants, including large financial institutions, would be sufficient to compensate the plaintiff.

This court finds that *Bloor* is inapposite to the facts herein. This litigation is still in its infancy and without statute of limitations considerations. Also, it is doubtful that Grant's partnership assets are sufficient to compensate all plaintiffs for potential damages exceeding one-billion dollars. Thus, it is conceivable, if not probable, that access to personal assets of individual partners will be sought.

The court is unpersuaded by predictions of a wholesale opt-out of partners exposed to astronomical damages. The S & Ls and Dauphin will merely commence efforts to join individual partners. Further, this court would be reluctant to permit partners choosing to opt-out the ability to rely on Grant's counsel and thus, individual representation will be required. It is a more reasonable assumption that partners would choose to minimize their losses and expenses by taking advantage of competent legal representation and remain in the class.

Class action is unquestionably the most effective and efficient vehicle for this litigation. A possible mass opt-out is not a sufficient basis for denying certification.

### B. Rule 23(b)(1)

The S & Ls and Dauphin also argue that certification is appropriate under Rule 23(b)(1). Rule 23(b)(1) provides that a class action may be maintained when the elements of Rule 23(a) are met and

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

This Rule provides neither opt-out nor detailed notice requirements.

### (1) Rule 23(b)(1)(A)

█ The Advisory Notes following Rule 23(b)(1)(A) suggest that when

[o]ne person may have rights against, or be under duties toward, numerous persons constituting a class, and be so positioned that conflicting or varying adjudi-

cations in lawsuits with individual members of the class might establish incompatible standards to govern his conduct [,] [t]he class action device can be used effectively to obviate the actual or virtual dilemma which would thus confront the party opposing the class.

Application of this Rule has been held to require more than a possibility of inconsistent judgments and resolutions of identical questions of law. E.g., *Green v. Occidental Petroleum Corp.,* 541 F.2d at 1340; *McDonnell Douglas Corp. v. U.S. District Court,* 523 F.2d 1083, 1086 (9th Cir.1975), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976).

An exception to *Green* and *McDonnell Douglas* was enunciated in *In re Itel Securities Litigation,* 89 F.R.D. at 104, 125. The *Itel* court certified separate defendant classes under Sections 11 and 12(2) of the Securities Act of 1933. The court certified a class of defendants under Section 11 pursuant to Rule 23(b)(3) and then determined that certification under Rule 23(b)(1) was appropriate for the Section 12(2) class as "the very same plaintiff would be suffering inconsistent adjudications on the same issue against the same defendant." *Id.* The same issue was presented in both the Section 11 and Section 12(2) claims. Thus, class certification was required under Rule 23(b)(1)(A).

The court has struggled in an effort to certify a defendant class within Rule 23(b)(1)(A) and finds that the factual considerations *sub judice* are more closely aligned with *Green* than with the *Itel* decision. Certification under Rule 23(b)(1)(A) is not available.

### (2) Rule 23(b)(1)(B)

■ As Rule 23(b)(1) provides for certification under either subsection (A) or subsection (B), the court's attention shifts to the second alternative under Rule 23(b)(1).

The Advisory Notes to subsection (B) indicate that this section contemplates

... situations where the judgment in a nonclass action by or against an individual member of the class, while not technically concluding the other members might do so as a practical matter. The vice of an individual action would lie in the fact that the other members of the class, thus practically concluded, would have no representation in the lawsuit.

In this instance, the court notes that should the class be certified pursuant to Rule 23(b)(3) and the partners proceed with a wholesale "opt-out", the S & Ls and Dauphin would be left with only one viable alternative—to effectuate service of process upon the individual partners. This alternative would delay the ability of this court to obtain jurisdiction over these partners. The court is reminded of the difficulties still confronting the efforts of other Grant litigants in effecting service of process: with the trial scheduled to commence in less than six (6) months, only one-third of the partners have been served properly. There is, therefore, a strong probability that numerous partners will not be before this court prior to the commencement of trial. There is also a strong probability that service of process upon numerous partners will not be effected until shortly prior to the commencement of trial. In either instance, the court would be obligated to conduct separate trials and unduly delay and postpone the ultimate resolution of the cases.

In this situation, a finding in the first trial that a Grant partner was responsible for authoring financial statements containing materially misleading information would substantially bar the other partners from asserting a contrary position.[9] Thus, these partners would be foreclosed from defending their interests. *In re Itel Securities Litigation,* 89 F.R.D. at 125; *Lynch Corp. v. MII Liquidating Co.,* 82 F.R.D. 478, 483 (D.S.D.1979).

The court notes that in *La Mar v. H. & B. Novelty & Loan Co.,* 489 F.2d 461 (9th Cir.1973), a more stringent test was ap-

---

**9.** The court again marks the fact that Jose Gomez has already pleaded guilty to various crimi-

nal violations arising from the issuance of financial statements.

plied. The court stated that if "the individual action *inescapably* will alter the substance of the rights of others having similar claims ... the situation falls within Rule 23(b)(1)(B)." *Id.* at 467. (Emphasis added). This court does not agree with the highly restrictive gloss applied to Rule 23(b)(1)(B). Application of the *La Mar* position that mere *stare decisis* effects of separate adjudications is insufficient for certification would render Rule 23(b)(1)(B) wholly ineffective and reduce it to mere surplussage. Quite clearly that was not the intent of the drafters.

In this instance, the court finds that the only method for protecting the rights of Grant partners is to require their appearance, at one time, before this court. Thus, they will not be faced with an inability to defend their interests owing to a prior determination on the primary issue of liability.

Additional consideration must also be given to protecting the partners' interests in a common fund—their professional liability insurance coverage. Separate adjudications conceivably would exhaust coverage leaving subsequently tried partners to pay legal fees from their own pocket and leave them with only personal assets from which to compensate plaintiffs. Thus, this court must concern itself with the interests of all partners while keeping an eye on the conservation of both partnership and individual assets. See, *In re Greenman Securities Litigation*, 94 F.R.D. at 277–78.

Finally, this court notes the practical problem considered in *Greenman*. Should individual partners be allowed to opt-out, this court faces the likely prospect of relitigating identical issues of law and fact in several trials. This occurrence would place an unnecessary burden upon the judicial system. *Id.*

Thus, while certification under Rule 23(b)(1)(A) is not justified, it is required by Rule 23(b)(1)(B).

### III. CONCLUSION

The court has determined that the requisite elements under Rule 23(a) are present in this litigation. The court also finds that certification of a defendant class is available under either Rule 23(b)(3) or Rule 23(b)(1). The final decision requires this court to choose between (b)(3) certification with its opt-out and notice provisions, or (b)(1) certification that does not afford a class member the privilege of opting-out nor does it impose stringent notice requirements upon the S & Ls and Dauphin. The court adopts the position that, in this instance, when either (b)(1) or (b)(3) governs, certification under Rule 23(b)(1) is more desirable to avoid multiplicity of effort. E.g., *Green v. Occidental Petroleum Corp.*, 541 F.2d at 1340; *Weinberger v. Jackson*, 102 F.R.D. at 849; *In re Greenman Securities Litigation*, 94 F.R.D. at 278. Accordingly, it is hereby

**ORDERED AND ADJUDGED** as follows:

1. The Motions for Certification of a Defendant Class filed by American Savings and Loan Association of Florida, First Federal Savings and Loan Association of Big Spring, Texas, Sun Federal Savings and Loan Association, First Atlantic Savings and Loan Association and County of Dauphin, Pennsylvania be and the same are **GRANTED.**

2. Defendant classes consisting of individuals who were Grant partners during the class period are certified pursuant to Rule 23(b)(1). See, Appendix B.

3. Within 15 days of the filing of this Order, the S & Ls and Dauphin shall prepare a form order regarding notice to members of the defendant class for this court's approval. A copy of the proposed order shall be provided to counsel for Grant. At the May 27, 1986 hearing, the court will entertain any objections to the proposed order.

4. Within 15 days of the filing of this Order, other plaintiffs may seek class certification in their case. Should any plaintiff fail to seek class certification within 15 days, its case shall proceed as a joinder action.

UNITED STATES OF AMERICA, Plaintiff,

v.

RONNIE R. EWTON, GEORGE G. MEAD, NICHOLAS B. WALLACE, CHARLES W. STREICHER, HENRY EARL RIDDEL, THOMAS F. SAUNDERS, STANLEY WOLFE, TIMOTHY R. MURPHY and JOSE L. GOMEZ, Defendants.

## INDICTMENT

18 U.S.C. § 371, 18 U.S.C. § 1341, 18 U.S.C. § 1343, 18 U.S.C. § 1014, 18 U.S.C. § 2.

The grand jury charges that:

## COUNT 1

### THE CONSPIRACY

1. From on or about January 1, 1977, up to and including March 4, 1985, in Broward County, in the Southern District of Florida, and elsewhere, the defendants,

RONNIE R. EWTON,

GEORGE G. MEAD,

NICHOLAS B. WALLACE,

CHARLES W. STREICHER,

HENRY EARL RIDDEL,

STANLEY WOLFE,

TIMOTHY R. MURPHY

and

JOSE L. GOMEZ,

unlawfully, willfully and knowingly did combine, conspire, confederate, agree, and reach a tacit understanding together and with each other and with others known and unknown to the grand jury to commit offenses against the United States, that is, mail fraud and wire fraud, in violation of Title 18, United States Code, Sections 1341 and 1343, in the operation of E.S.M. Government Securities, Inc.

2. It was the essence of the conspiracy and fraud that the co-conspirators concealed and falsely reported the financial condition of E.S.M. Government Securities, Inc. ("E.S.M. Government"), through false and fraudulent journal entries and financial statements and sent the financial statements to customers to induce them to wire funds for E.S.M. Government's use. Customers were induced to enter into transactions which were, in substance, loans to E.S.M. Government. The co-conspirators represented these transactions to be low-risk investments, with government securities as collateral for the loans. In fact, these were investments of great risk, as E.S.M. Government had insufficient collateral to secure them. Indeed, E.S.M. Government often pledged the same securities both among its customers and as collateral for other loans to it from banks.

### BACKGROUND

3. The defendants in this indictment, with the exception of defendant JOSE L. GOMEZ (see paragraph 15 below), were officers, directors and employees of E.S.M. Government, which was a broker-dealer, that is, a securities trading firm which bought, sold, traded and held government securities both for customers and for its own account. The government securities included United States Treasury Bills, United States Treasury Bonds, United States Treasury Notes, Federal National Mortgage Association securities and Government National Mortgage Association securities.

4. The primary business of E.S.M. Government was the trading of government securities through repurchase and reverse repurchase agreements. A repurchase agreement is a contract for the broker-dealer to sell securities to its customers together with a simultaneous agreement that the broker-dealer will buy back the same securities at a later date for the contract price plus interest. Repurchase agreements are essentially short-term loans to the broker-dealer from customers with government securities as collateral for

the loans. The customers, that is, the lenders, who enter into repurchase agreements are often local governmental units with large amounts of cash (for example, their tax revenues) available for short-term low-risk investments. Customers may take actual delivery of the securities pledged in repurchase agreements or they may leave them with the broker-dealer's clearing bank. If left with the broker-dealer, the broker-dealer may not use these securities as collateral for other loans or grant anyone else an interest in them.

5. E.S.M. Government obtained securities that it used to collateralize the repurchase agreements through transactions known as reverse repurchase agreements. In effect, in these agreements, the broker-dealer borrows the securities it uses as collateral for repurchase agreements. In a reverse repurchase agreement, a seller (who is essentially borrowing cash from the broker-dealer) transfers securities to a broker-dealer in exchange for cash. The borrower-seller simultaneously agrees to repay the cash plus interest in exchange for the return of the securities.

6. E.S.M. Government was wholly owned by its parent, E.S.M. Group, Inc. ("E.S.M. Group"). E.S.M. Group had other subsidiaries. E.S.M. Group was affiliated with E.S.M. Financial Group, Inc. ("E.S.M. Financial"), which was wholly owned by defendant RONNIE R. EWTON. E.S.M. Group, its subsidiaries and E.S.M. Financial are referred to in this indictment as "the E.S.M. entities."

7. The offices of the E.S.M. entities, were located first at One Financial Plaza, Fort Lauderdale, Florida and later at 1512 E. Broward Boulevard, Fort Lauderdale, Florida.

### THE DEFENDANTS

8. Until January 25, 1985, Defendant RONNIE R. EWTON (the "E" of E.S.M.) was Chairman of the Board of E.S.M. Group (and owner of 62.2% of its stock) and E.S.M. Government and President, Secretary and a Director of E.S.M. Financial. During the period of this indictment, EW-TON received $1,405,094 in salary and commissions, $1,650,000 in bonuses, and $21,-960,323 in loans and accrued interest from the E.S.M. entities.

9. Defendant GEORGE G. MEAD (the "M" of E.S.M.) was Executive Vice-President and a Director of E.S.M. Group (and owner of 19.5% of Group's stock); Vice-President and a Director of E.S.M. Financial and Vice-President, Treasurer and a Director of E.S.M. Government. During the period of this indictment, MEAD received $1,498,831 in salary and commissions, $1,150,000 in bonuses, and $3,476,868 in loans and accrued interest from the E.S.M. entities.

10. Defendant NICHOLAS B. WALLACE was Vice-President and Secretary of E.S.M. Group (and owner of 6.1% of its stock); President, Secretary and a Director of E.S.M. Government. During the period of this indictment, WALLACE received $1,312,083 in salary and commissions, $1,150,000 in bonuses, and $6,604,454 in loans and accrued interest from the E.S.M. entities.

11. Defendant CHARLES W. STREICHER was Vice-President and Director of E.S.M. Group and Vice-President of E.S.M. Government (and owner of 6.1% of Group's stock). During the period of this indictment, STREICHER received $1,289,308 in salary and commissions, $830,000 in bonuses, and $706,212 in loans and accrued interest from the E.S.M. entities.

12. Defendant HENRY EARL RIDDEL was the Comptroller of the various E.S.M. entities from March 1, 1976 until August 1, 1982. He was responsible for the books and records of the E.S.M. entities during this period.

13. Defendant STANLEY WOLFE was employed by E.S.M. from March 20, 1978 until March 5, 1985 and was in charge of clearing operations. In this capacity he controlled and monitored the wiring of securities and money to and from clearing banks and monitored securities pledged by E.S.M. Government to secure loans to it.

14. Defendant TIMOTHY R. MURPHY was employed by E.S.M. from January 30, 1978 until March 5, 1985 and from 1981 on was in charge of the "Repo Desk." In this capacity he was in charge of assigning collateral among repurchase customers.

15. Defendant JOSE L. GOMEZ, was a Certified Public Accountant employed by and later a partner at Alexander Grant & Company ("Grant"), a national firm of Certified Public Accountants with a branch office in Fort Lauderdale, Florida. Gomez was responsible for directing and controlling the auditing and tax services which Grant provided for the E.S.M. entities from in and around November 1976 until March 1985. These services included audits and certifications of the year end financial statements for E.S.M. Government for the years 1977–1984. (The 1984 financial statement and opinion was withdrawn on March 1, 1985.)

## THE FRAUD

16. The co-conspirators conspired to defraud their customers to induce them to enter into repurchase and reverse repurchase agreements. They sought to conceal and cover up the fact that E.S.M. Government had sustained substantial losses during the entire period of its operation and to prolong its existence for their benefit. They carried out the fraud through false journal entries, false financial statements, concealment of excess borrowing, overpledging of collateral and false safekeeping letters.

### False Journal Entries

17. The co-conspirators concealed the losses by false journal entries in E.S.M. Government's books which had the effect of shifting the losses to E.S.M. Government's unaudited parent E.S.M. Group. Fictitious transactions between E.S.M. Government and E.S.M. Group were created with fictitious paperwork supporting fictitious journal entries.

18. E.S.M. Government's losses, which had been transferred to E.S.M. Group, were further concealed by fraudulent journal entries transferring the losses from E.S.M. Group to its affiliate E.S.M. Financial. Additionally, officers took their loans from E.S.M. Financial. E.S.M. Financial's losses grew from $144,112 in 1976 to $195,433,000 at the end of 1984. E.S.M. Financial was insolvent and had no ability to repay amounts reflected on E.S.M. Group's books as due from it. As of December 31, 1984, E.S.M. Financial owed E.S.M. Group $246,992,374. E.S.M. Government and E.S.M. Group were, thus, insolvent also. E.S.M. Financial's books and records were not audited, and its condition was not disclosed to customers and potential customers.

19. Alexander Grant & Co., the allegedly independent auditor, issued a Statement of Financial Condition and Auditors Report for E.S.M. Government each year without qualification or limitation and with Grant's statement that the audit had been conducted in accordance with generally accepted auditing standards and that in Grant's opinion the statements fairly presented E.S.M. Government's financial position. In fact, the financial statements of E.S.M. Government did not reflect the true financial position of the company, as the statements concealed the unmatched repurchase agreement positions (see paragraph 21) and the mounting losses. The auditors were not independent as the defendant JOSE GOMEZ had agreed to conceal and cover up the losses and fraudulently represent the condition of E.S.M. Government and had received substantial sums of money from co-conspirators.

20. As the co-conspirators well knew, copies of the audited financial statements and audit report of E.S.M. Government were sent through the mail to its customers and potential customers who relied upon these statements and reports in deciding whether to enter into financial transactions with E.S.M. Government.

### Concealment of Excess Borrowing

21. The false journal entries also had the effect of falsely portraying E.S.M. Government's operations as a matched

book, a balanced holding of repurchase and reverse repurchase agreements. In fact, E.S.M. Government had borrowed hundreds of millions of dollars more than it loaned. These borrowings were necessary in order to finance the growing losses of E.S.M. Government. Reverse repurchase agreement customers (borrowers) were induced through preferential interest rate treatment to provide excess collateral to E.S.M. Government so that E.S.M. Government could enter into additional repurchase agreements, and obtain more cash. On occasion, E.S.M. Government even paid higher interest rates to its repurchase agreement holders than it obtained from reverse repurchase agreement holders in order to obtain cash necessary to sustain the operation. At the time of its collapse, E.S.M. Government had borrowed approximately 1.6 billion dollars from its customers and had lent approximately 1.3 billion dollars.

### Overpledging of Collateral

22. Cash necessary to sustain the operation was also obtained through loans to E.S.M. Government from the clearing banks. The losses sustained by E.S.M. Government meant that E.S.M. Government did not have sufficient collateral to secure both the clearing banks which extended loans to it and its repurchase agreement customers. The co-conspirators caused securities held at the clearing banks to be pledged to secure both E.S.M. Government's loans from the clearing banks and the repurchase agreements. In some instances, securities were triple pledged among the clearing banks and more than one repurchase agreement holder.

### Safekeeping Letters

23. The co-conspirators concealed and covered up this double and triple pledging from their customers. Until in and around May 1984, many repurchase agreement holders who did not take delivery of the collateral pledged to secure their repurchase agreements were assured by E.S.M. Government in letters sent through the mail that their securities "will be segregated for you by [clearing banks] and held by them in our customer securities account." Repurchase agreement customers were thereby misled into believing that they had a security interest in or lien on identifiable securities held at the clearing banks. In fact, these securities were not segregated in any fashion but were commingled in E.S.M. Government's clearance account and were, as noted above, pledged to secure loans to E.S.M. Government itself. On or about May 8, 1984, the co-conspirators changed the text of this letter to "These securities will be at [the clearing bank] and held by them in our customer securities account." This altered statement was still false, fraudulent and misleading, in that the operations had not changed, the securities were still not being held for the customers' benefit and the letter still concealed the double and triple pledging.

24. In November 1984, E.S.M. Government's Chief Financial Officer Alan Novick died. Defendant RONNIE EWTON resigned on January 25, 1985. Defendant JOSE L. GOMEZ withdrew the audited 1984 financial statement and auditor's opinion on February 28, 1985. During this same period, E.S.M. Government was losing certain essential sources of government securities which it needed as collateral for repurchase agreements, and the loss of other sources was threatened. Defendant GEORGE MEAD closed E.S.M. Government on March 2, 1985.

25. The co-conspirators received large sums of money from the E.S.M. entities which they used to enjoy extravagant life styles. They sought to enrich themselves and falsely to convey to the public the image that the trading activities of the E.S.M. entities were successful when, in fact, they were a failure and a fraud.

### OVERT ACTS

The following overt acts among others, were committed in furtherance of the con-

spiracy in the Southern District of Florida, and elsewhere:

1. On or about May 21, 1980, NICHOLAS B. WALLACE, in an effort to forestall public disclosure in a lawsuit of E.S.M. Government's poor financial condition and the fraudulent nature of its financial statements, confided to certain persons that E.S.M. Government hid its losses in a cleverly designed financial statement.

2. On or about October 16, 1980, RONNIE R. EWTON called an attorney to set up a trust to pay JOSE GOMEZ.

3. In and around July 1981, RONNIE R. EWTON, NICHOLAS B. WALLACE, CHARLES W. STREICHER, and others negotiated a settlement with E.S.M. Financial's former president, which required him (the former president) to promise not to reveal what he knew about E.S.M.'s operations and losses.

4. On or about December 29, 1983, JOSE L. GOMEZ and others caused a fraudulent $25,000,000 adjustment to the basis of E.S.M. Government's inventory to be made in order to avoid the booking of further losses.

5. In and around December 1983, RONNIE R. EWTON, GEORGE G. MEAD, NICHOLAS B. WALLACE and others had a meeting to discuss managing and concealing the mounting E.S.M. deficit.

6. In and around May 1984, STANLEY WOLFE and TIMOTHY R. MURPHY and others met to change the text of the letter sent to many non-delivery customers which falsely stated that their securities were segregated at the clearing bank.

On or about November 26, 1984, RONNIE R. EWTON, GEORGE G. MEAD, NICHOLAS B. WALLACE, CHARLES W. STREICHER and JOSE GOMEZ met to discuss managing and concealing the mounting E.S.M. deficit and continuing operations after the death of Chief Financial Officer Alan Novick.

8. In and around January 1985, GEORGE G. MEAD and STANLEY WOLFE travelled to New York to seek new credit lines for E.S.M.

9. In and around January 1985, STANLEY WOLFE and TIMOTHY R. MURPHY directed E.S.M. Government employees to begin typing confirmations for non-delivery customers to avoid using the data processing system so that their transactions would not be recorded by the clearing bank.

10. On or about February 15, 1985, JOSE GOMEZ gave GEORGE MEAD an unsigned 1984 E.S.M. Government financial statement.

11. On or about February 15, 1985, GEORGE MEAD travelled to Ohio to the Home State Savings Bank and presented to the bank officials unsigned 1984 E.S.M. Government financial statement and a report fraudulently portraying the investment of Home State Savings Bank with E.S.M. Government as a "matched book".

12. On or about February 27, 1985, JOSE GOMEZ gave GEORGE MEAD the signed 1984 E.S.M. Government financial statement.

All in violation of Title 18, United States Code, Section 371.

### APPENDIX B
### CLASS PERIODS

1. 85–0763 (AMERICAN SAVINGS) January 1, 1984–March 4, 1985
2. 85–6369 (BIG SPRING) January 1, 1982–March 4, 1985
3. 85–6592 (SUN FEDERAL) January 1, 1984–March 4, 1985
4. 85–6677 (DAUPHIN) January 1, 1981–March 4, 1985
5. 86–6226 (FIRST ATLANTIC) January 1, 1980–March 4, 1985